# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1987

_____

|  |  |  |
|---|---|---|
| PRM Energy Systems, Inc., an Arkansas Corporation, | * * * | |
| Plaintiff - Appellant, | * * | |
| Energy Process Technologies, Inc., | * * | |
| Plaintiff, | * * | |
| v. | * * * | Appeal from the United States District Court for the Western District of Arkansas. |
| Primenergy, L.L.C., an Oklahoma Limited Liability Company; Don R. Mellot; W.N. Scott, also known as Bill Scott, | * * * * * | |
| Defendants, | * * | |
| Kobe Steel, Ltd., | * * | |
| Defendant - Appellee. | * | |

_____

Submitted: October 15, 2008
Filed: January 8, 2010

_____

Before MELLOY, BEAM, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

PRM Energy Systems, Inc. ("PRM"), licensed certain gasification technology patents to Primenergy, L.L.C. ("Primenergy"). Through a network of agreements (the "1999 Agreements"), PRM licensed Primenergy to use the gasification technology and enter into sublicense agreements in a number of countries. After a series of disputes between PRM and Primenergy, PRM brought claims against Kobe Steel, Ltd. ("Kobe Steel"), a potential licensee, for tortious interference with, and inducement to breach, the 1999 Agreements and for conspiring with Primenergy to convert PRM's intellectual property for their own use.

Kobe Steel moved to compel arbitration of PRM's claims pursuant to arbitration provisions in the 1999 Agreements, and the district court[1] granted Kobe Steel's motion. PRM now appeals, arguing that Kobe Steel, as a nonsignatory to the 1999 Agreements, should not be permitted to enforce the arbitration provisions from those Agreements. We affirm.

I.

To give context to this dispute, we set forth the facts as alleged in PRM's complaint.

In the 1999 Agreements, PRM licensed Primenergy to use PRM's gasification technology in a number of countries, including the United States but not including Japan. Although Primenergy's license did not extend to Japan, Primenergy maintains that the 1999 Agreements gave it a right of first refusal for a license in Japan. In 2001, a U.S. subsidiary of Kobe Steel (a Japanese company) contacted PRM and

_____

[1] The Honorable Jimm Larry Hendren, Chief Judge, United States District Court for the Western District of Arkansas.

-2-

expressed its interest in licensing the technology in the United States. PRM referred the subsidiary to Primenergy. In 2002, Kobe Steel began discussing licensing in Japan with PRM, but Kobe Steel declined to sign a confidentiality agreement, and the discussions stalled. At the same time, Kobe Steel was allegedly negotiating with Primenergy, inducing Primenergy to breach the 1999 Agreements by sublicensing the technology to Kobe Steel and planning joint projects in Japan. In 2003, Kobe Steel and Primenergy reached a collaboration agreement in violation of the territorial restrictions in the 1999 Agreements. Neither Primenergy nor Kobe Steel disclosed this agreement to PRM.

Unaware of the collaboration between Primenergy and Kobe Steel, PRM executed an option granting an unrelated company a license for the technology in Japan. In 2004, Primenergy filed a demand for arbitration seeking to force PRM to terminate the option, citing Primenergy's purported right of first refusal. Primenergy also sought to invalidate certain royalty provisions of the 1999 Agreements because the underlying patents had expired. PRM asserted several cross-claims in the arbitration, including a claim that Primenergy breached the 1999 Agreements by having undisclosed dealings with Kobe Steel. In a final ruling on April 22, 2005, an arbitrator found that the royalty provisions were unenforceable and that both parties had breached the 1999 Agreements in regard to obligations concerning the territory of Japan. The arbitrator enjoined Primenergy from further discussions with Kobe Steel for a period of two years, but it did not award damages because PRM had not shown any.

In 2004, while the arbitration between PRM and Primenergy was pending, PRM filed a complaint in the district court against Primenergy and its officers alleging breach of contract, fraud, conspiracy, misappropriation of trade secrets, unfair competition, and tortious interference. On March 24, 2005, PRM filed a complaint in a separate action against Kobe Steel asserting tortious interference and conspiracy. On May 18, 2005, PRM filed an amended complaint in its lawsuit against Primenergy

that included specific allegations concerning the interactions between Primenergy and Kobe Steel. On November 15, 2005, the district court granted PRM's motion to consolidate the two actions, but it dismissed the claims against Primenergy, concluding that the claims were subject to arbitration.

On November 18, 2005, PRM filed an amended complaint against Kobe Steel, asserting the existence of a confidentiality agreement and several exclusive collaboration agreements between Primenergy and Kobe Steel. PRM further alleged that Primenergy and Kobe Steel conspired to hide their dealings from PRM and that Primenergy and Kobe Steel, through their concerted actions, were attempting to negotiate lower royalty premiums and broader territorial rights for the licensing of PRM's technology.

On March 21, 2006, the district court confirmed an April 2005 arbitration decision from the arbitration between PRM and Primenergy. Kobe Steel and PRM then filed cross-motions for judgment on the pleadings as to PRM's claims against Kobe Steel. On June 19, 2006, the district court granted Kobe Steel's motion in part, allowing Kobe Steel to compel arbitration. The district court also entered a stay of the proceedings. The district court held that Kobe Steel could enforce the arbitration provisions of the 1999 Agreements on an estoppel theory because "all of PRM's claims either make reference to or presume the existence of the 1999 Agreements, and allege substantially interdependent and concerted misconduct by both the nonsignatory [Kobe Steel] and one or more of the signatories [Primenergy] to the contract." An arbitrator subsequently dismissed the claims against Kobe Steel. The district court later confirmed the arbitrator's dismissal of the claims, and PRM now appeals the June 19, 2006 order compelling the arbitration.[2]

---

[2] The district court's interlocutory order directing arbitration and staying the proceedings was not an immediately appealable "final decision." Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 87 n.2 (2000). It became "final" within the meaning of 9 U.S.C. § 16(a)(3), and thus appealable, upon the later dismissal of the claims. See Randolph, 531 U.S. at 88–89.

## II.

"This court reviews de novo a district court's grant of a motion to compel arbitration." Donaldson Co., Inc. v. Burroughs Diesel, Inc., 581 F.3d 726, 730 (8th Cir. 2009) (internal quotation omitted). The first question before us is whether a nonsignatory defendant may compel a signatory plaintiff to arbitrate claims under a valid arbitration agreement where the relationship between the parties is based on the concerted misconduct of the defendant and a different signatory. As we recognized in Donaldson, the Supreme Court has held that "state contract law governs the ability of nonsignatories to enforce arbitration provisions." Id. at 732; Arthur Andersen LLP v. Carlisle, 129 S. Ct. 1896, 1902 (2009) ("'State law,' therefore, is applicable to determine which contracts are binding under § 2 [of the Federal Arbitration Act] and enforceable under § 3 '*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.'" (quoting Perry v. Thomas, 482 U.S. 483, 493 n.9 (1987))).

The Supreme Court issued Arthur Andersen, and our court issued Donaldson, however, long after the district court ordered and subsequently confirmed arbitration in the present case and after the parties briefed and argued this matter to our court. Below, the district court applied federal law to address Kobe Steel's ability to invoke the arbitration provisions of the contract between PRM and Primenergy. In its brief on appeal, PRM argues that federal law applies, and Kobe Steel cites only federal law in its brief as to this issue. Accordingly, we rely primarily upon the federal law as discussed by the parties on appeal, and by the district court below, regarding the ability of a nonsignatory to compel arbitration.[3]

---

[3] Kobe Steel cited Arthur Andersen and an Arkansas case, American Insurance Company v. Cazort, 871 S.W.2d 575, 579–80 (Ark. 1994), in a letter to our court in accordance with Eighth Circuit Rule of Appellate Procedure 28(j). PRM did not respond to this letter. Kobe Steel asserts that Cazort would permit a nonsignatory to

As a starting point, we note that a nonsignatory may compel a signatory to arbitrate claims in limited circumstances.  See, e.g., Finnie v. H & R Block Fin. Advisors, Inc., 307 F. App'x 19, 21 (8th Cir. 2009) (unpublished per curiam) (compelling arbitration based on a close relationship between signatories and nonsignatories); CD Partners, LLC v. Grizzle, 424 F.3d 795, 798–99 (8th Cir. 2005) (discussed *infra*); MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947–48 (11th Cir. 1999) (same); Thompson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir. 1995) (applying an estoppel theory based on a close relationship of parties and claims that were intertwined with contract rights and duties); Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1121 (3d Cir. 1993) (applying a "traditional agency theory" regarding a nonsignatory employee of a signatory); see also  Am. Ins. Co. v. Cazort, 871 S.W.2d 575, 579–80 (Ark. 1994).

In CD Partners, we recognized two such circumstances.  See CD Partners, 424 F.3d at 798.  The first relies on agency and related principles to allow a nonsignatory to compel arbitration when, as a result of the nonsignatory's close relationship with a signatory, a failure to do so would eviscerate the arbitration agreement. Id.; see also Nesslage v. York Secs., Inc., 823 F.2d 231, 233 (8th Cir. 1987) (permitting a

_____

compel arbitration under Arkansas law.  In light of Arthur Andersen and Donaldson, and notwithstanding the history of this case, we conducted an independent review of Arkansas law (the only state's law arguably applicable to the present agreement).  We determined that Arkansas law was consistent with our analysis as set forth herein and would lead to the same result.  See Cazort, 871 S.W.2d at 579–80 (holding that an insurer-nonsignatory could compel arbitration pursuant to an arbitration agreement between an insured-broker and one of the broker's clients, stating, "'In short, [plaintiff] cannot have it both ways. It cannot rely on the contract when it works to its advantage and ignore it when it works to its disadvantage.'" (quoting Tepper Realty Co. v. Mosaic Tile Co., 259 F. Supp. 688, 692 (S.D.N.Y. 1966))).  In fact, in Cazort, the Arkansas Supreme Court cited with approval Hughes Masonry Co. v. Greater Clarke County School Building Corporation, 659 F.2d 836, 838–41 (7th Cir. 1981), and the federal cases we cite herein rely, in part, on Hughes Masonry and the reasoning of the Seventh Circuit in that case.

nonsignatory to compel arbitration where it was the "disclosed agent" of a signatory). The second relies loosely on principles of equitable estoppel, broadly encompasses more than one test for its application, and has been termed "alternative estoppel." CD Partners, 424 F.3d at 799 ("A willing nonsignatory seeking to arbitrate with a signatory that is unwilling may do so under what has been called an alternative estoppel theory *which takes into consideration the relationships of persons, wrongs, and issues . . . .*'") (quoting Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 131 (2d Cir. 2003)) (alteration omitted, emphasis added). Alternative estoppel typically relies, at least in part, on the claims being so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement. See Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993) (citing with approval and adopting the reasoning of Hughes Masonry Co. v. Greater Clarke County Sch. Bldg Corp., 659 F.2d 836, 838 (7th Cir. 1981)).

The specific theory or test for application of alternative estoppel that formed the basis of the district court's decision in the present case relies on the interdependent and concerted misconduct of a nonsignatory and a signatory. Kobe Steel argues that the district court was correct in applying this test. In addition, Kobe Steel argues that other theories of alternative estoppel apply and that the close relationship or agency theory recognized in CD Partners provides an independent basis for compelling arbitration in the present case. Because we conclude that the district court correctly relied upon the theory of concerted misconduct, we confine our discussion to concerted misconduct.

In CD Partners, we relied upon MS Dealer in which the Eleventh Circuit set forth the theory of concerted misconduct as a basis to compel arbitration when there is no agency or other close relationship between the signatory plaintiff and nonsignatory defendant. MS Dealer, 177 F.3d at 947 ("[A]pplication of equitable

estoppel is warranted . . . when the signatory to the contract containing the arbitration clause raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.") (alteration and quotation omitted). The district court in the instant case, turning to MS Dealer as persuasive authority, imported the Eleventh Circuit's "concerted misconduct" basis for applying alternative estoppel.

Subsequently, in Donaldson, we discussed concerted misconduct at some length, described the type of claims and allegations that would be necessary to invoke this theory, but found the theory inapplicable on the facts of that case. 581 F.3d at 733–35. We said that to warrant the benefit of alternative estoppel based on concerted misconduct, at a minimum, "the plaintiff must specifically allege coordinated behavior between a signatory and a nonsignatory." Id. at 734. We did not "suggest that a claim against a co-conspirator . . . will always be intertwined to a degree sufficient to work an estoppel." Ross v. Am. Express Co., 547 F.3d 137, 148 (2d Cir. 2008) (quotation omitted). Rather, we stated, "The concerted-misconduct test requires allegations of 'pre-arranged, collusive behavior' demonstrating that the claims are 'intimately founded in and intertwined with' the agreement at issue." Donaldson, 581 F.3d at 734–35 (quoting MS Dealer, 177 F.3d at 948). Ultimately, we found on the facts of Donaldson that there was no allegation of "pre-arranged collusive behavior" as "required by the case law" of other circuits. Id. at 734 ("Although [the] cross-claim made common allegations against [the signatory and nonsignatory], it did not make any allegations suggesting that [they] knowingly acted in concert, improperly cooperated, or worked hand-in-hand." (internal quotations omitted)). As such, although we have recognized and described the theory of concerted misconduct, we have not yet expressly applied it to compel a party to arbitration.

Here, we believe that the nature of the alleged misconduct and its connection to the contract demonstrates the requisite relationships between persons, wrongs, and issues necessary to compel arbitration. PRM "specifically allege[d] coordinated

behavior between a signatory and a nonsignatory." Id. The 1999 Agreements anticipated that an entity such as Kobe Steel might enter into a licensing relationship with Primenergy, and the 1999 Agreements attempted to govern that expected relationship. This is not a situation, then, where the nonsignatory co-conspirator "is a complete stranger to the plaintiffs' . . . agreements[,] . . . did not sign them, . . . is not mentioned in them, and . . . performs no function whatsoever relating to their operation." Ross, 547 F.3d at 148.

Collusive conduct between Kobe Steel and Primenergy allegedly arose from this potential relationship. PRM alleges that Kobe Steel and Primenergy concealed their actions from PRM, conspired to violate the terms of the 1999 Agreements, and attempted to undermine the 1999 Agreements' contemplated authority over licensee and sub-licensee relationships. The alleged collusive actions not only arose out of and targeted the 1999 Agreements, they were "intimately founded in and intertwined with" Primenergy's underlying contract obligations. Donaldson, 581 F.3d at 735 (quoting MS Dealer, 177 F.3d at 947). As such, we agree with the district court's conclusion that "PRM's claims either make reference to or presume the existence of the 1999 Agreements, and allege substantially interdependent and concerted misconduct by both the nonsignatory [Kobe Steel] and one or more of the signatories [Primenergy] to the contract." Accordingly, the district court did not err in its reliance on a concerted-misconduct theory of alternative estoppel to grant nonsignatory Kobe Steel's motion to compel arbitration.

### III.

PRM further contends that even if Kobe Steel can compel arbitration, PRM's claims against Kobe Steel are outside of the scope of the arbitration clause of the 1999 Agreements. "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," including "the construction of the contract language itself." Moses H. Cone Mem'l Hosp. v. Mercury

Constr. Corp., 460 U.S. 1, 24–25 (1983); see also Telectronics Pacing Sys., Inc. v. Guidant Corp., 143 F.3d 428, 430–31 (8th Cir. 1998) ("[A]ny doubts raised in construing contract language on arbitrability should be resolved in favor of arbitration." (internal quotations and alterations omitted)).[4]  In determining whether the scope of the arbitration clause is broad enough to cover the claims at issue, we do not consider the fact that the defendant is not party to the agreement containing the clause.  CD Partners, 424 F.3d at 801 n.3.

The arbitration clause here covers "all disputes arising under" the agreement, and PRM argues this language is substantially narrower than the corresponding language at issue in CD Partners.  The CD Partners arbitration clause included "any claim, controversy or dispute arising out of or relating to" the agreement.  Id. at 797, 800.  While PRM asserts that the language at issue here is narrower than that in CD Partners, see Coregis Ins. Co. v. Am. Health Found., Inc., 241 F.3d 123, 128–29 (2d Cir. 2001) (discussing "related to" as broader than "arising out of" where contract provision uses both terms), we note that in CD Partners we did not rely solely on the broader "related to" portion of the arbitration clause.  Rather, we held that the claims "had their genesis in, arose out of, *and* related to" the operations under the contracts.  CD Partners, 424 F.3d at 801 (emphasis added).  And even though the clause here may be somewhat narrower, it includes no limiting language and is generally broad in scope.  See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 416  n.3 (4th Cir. 2000) (recognizing "[a]ny dispute arising out of the Contract" as "broad"); United Food and Commercial Workers Union, Local 400 v. Shoppers Food Warehouse Corp., 35 F.3d 958, 960 (4th Cir. 1994) (stating that

---

[4]In determining the arbitrability of a dispute, we generally apply these principles as matters of "federal substantive law," Moses H. Cone, 460 U.S. at 24, informed by "'traditional principles'" of relevant state law, Arthur Andersen, 129 S. Ct. at 1902 (quoting 21 R. Lord, Williston on Contracts § 57:19, p. 183 (4th ed. 2001)).  See also First Option of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995).  Here, neither party contends that any particular state's law applies.

"arises under" is "relatively broad"); cf. Heckler v. Ringer, 466 U.S. 602, 615 (1984) (broadly construing "arising under" in statutory language).

Arbitration may be compelled under "a broad arbitration clause . . . as long as the underlying factual allegations simply 'touch matters covered by' the arbitration provision." 3M Co. v. Amtex Sec., Inc., 542 F.3d 1193, 1199 (8th Cir. 2008) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 n.13 (1985)). It generally does not matter that claims sound in tort, rather than contract. Hudson v. ConAgra Poultry Co., 484 F.3d 496, 499–500 (8th Cir. 2007) ("Under the Federal Arbitration Act, we generally construe broad language in a contractual arbitration provision to include tort claims arising from the contractual relationship, and we compel arbitration of such claims."); CD Partners, 424 F.3d at 800 ("Broadly worded arbitration clauses . . . are generally construed to cover tort suits arising from the same set of operative facts covered by a contract between the parties to the agreement."). In light of the interpretive preference for arbitration, we have no trouble concluding that PRM's tort claims are "disputes arising under" the 1999 Agreements and are therefore within the scope of the broad arbitration clause.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.


BEAM, Circuit Judge, dissenting.

I disagree with the court's conclusion that the nature of PRM's claims are connected to the contract and demonstrate the requisite relationships between persons, wrongs, and issues necessary to compel arbitration. The arbitration clause tangentially at issue here purports to cover "all disputes arising under" a technology licensing agreement between PRM and Primenergy.

-11-

The problem is, insofar as this appeal is concerned, that PRM asserts only a garden variety tort claim against Kobe Steel that does not directly touch either the subject matter or the geographic reach of the PRM/Primenergy contract itself. Indeed, according to PRM, the tortious activities of Kobe Steel deal with transactions beyond the scope, and purposefully outside of, the licensing authority granted Primenergy. To be sure, it is axiomatic that in order for Kobe Steel to have engaged in the alleged misconduct it must have had knowledge of the 1999 Agreements but that is the extent of the allegations' involvement with those agreements.

This is clearly not the situation discussed in Ross v. American Express Co., 547 F.3d 137, 148 (2d Cir. 2008), one of the principal cases relied upon by the court. Nor does PRM allege the sort of interdependent and concerted misconduct discussed in Donaldson sufficient to place the claims within the scope of the arbitration clause. Donaldson Co., Inc. v. Burroughs Diesel, Inc., 581 F.3d 726, 733-34 (8th Cir. 2009) (discussing the application of the concerted misconduct test in MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 945, 948 (11th Cir. 1999), wherein the plaintiff alleged that a non-signatory worked hand-in-hand with the signatory in a fraudulent scheme intertwined with and involving the obligations imposed by the contract containing the arbitration clause). Certainly, because of Kobe Steel's allegedly surreptitious negotiations with Primenergy seeking to circuitously obtain the benefits of PRM's technology for use in Japan, Kobe Steel is not "a complete stranger to the plaintiffs' . . . agreements." Ross, 547 F.3d at 148. But, Kobe Steel is virtually so. The PRM/Primenergy agreements do not mention Kobe Steel and perform no function whatsoever relating to the supposed Kobe Steel/Primenergy "exclusive collaboration" agreement. And, Kobe Steel was never a participant in the PRM/Primenergy deal.

Thus, the concerted misconduct requirements of Donaldson, the case that mainly drives the court's analysis in this appeal, are almost totally absent. 581 F.3d at 733-34. Accordingly, as in Donaldson, this litigation, too, lacks sufficient

allegations of pre-arranged collusive behavior, and Kobe Steel's arbitration demand should be rejected.  Id. at 735.

I dissent.

_____