NOTICE: NOT FOR PUBLICATION.
UNDER ARIZ. R. SUP. CT. 111(c), THIS DECISION DOES NOT CREATE LEGAL PRECEDENT
AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

DAN CAREY, *Plaintiff/Appellee,*

*v.*

K&M SEAFOOD FINANCIAL, LLC, an Arizona limited liability
company; GARY SOUCY and THERESA SOUCY, husband and wife;
JOSEPH SOUCY, a single man; RANDY BRONNER and JANE DOE
BRONNER, husband and wife, *Defendants/Appellants.*

No. 1 CA-CV 13-0357
FILED 12-02-2014

---

Appeal from the Superior Court in Maricopa County
No. CV2012-092926
The Honorable David M. Talamante, Judge

**REVERSED AND REMANDED**

---

COUNSEL

Slaton & Sannes, PC, Scottsdale
By Joel E. Sannes
*Counsel for Plaintiff/Appellee*

Hovore Law PLLC, Scottsdale
By F. Thomas Hovore
*Counsel for Defendants/Appellants*

---

**MEMORANDUM DECISION**

Judge Maurice Portley delivered the decision of the Court, in which Chief Judge Diane M. Johnsen and Judge Patricia K. Norris joined.

---

**P O R T L E Y,** Judge:

¶1        In this appeal, we decide whether a clause requiring the parties to allow the American Arbitration Association to resolve "[a]ny dispute arising under this [a]greement" encompasses the counts in Dan Carey's complaint.  Because we conclude that all the pending claims are subject to arbitration, we vacate the trial court's order and remand with instructions to order arbitration.

**BACKGROUND**

¶2        Carey heard, and alleged in his complaint, that K&M Seafood Financial LLC ("K&M") was offering to sell securities.  After he made an inquiry, Randy Bronner, acting on behalf of Joseph Soucy dba BD Resourcing, sent a proposed Investment Agreement ("Agreement").  The Agreement provided K&M would pay monthly interest of two percent on any investment, and K&M would return Carey's investment "with sixty (60) days written notice for all amounts under $100,000 and ninety (90) days for all amounts over $100,000."  Carey, however, requested Bronner revise the Agreement to include information about the limited use of his investment.  A few days later and without waiting for a revised Agreement, Cary paid K&M $100,000.  Carey never signed the original Agreement or received a revised Agreement.

¶3        K&M paid Carey three monthly interest payments of $2000.  Gary Soucy, K&M's Chief Executive Officer, subsequently notified Carey that K&M's partner had "diverted significant funds and inventory belonging to the Company."  After Carey demanded return of his $100,000, K&M's legal counsel responded that the company was suspending "all interest payments, distributions, and disbursements."

¶4 Carey then sued K&M, Gary Soucy and his spouse, Joseph Soucy dba BD Resourcing, and Randy Bronner and his spouse (collectively "Defendants"). Carey's amended complaint alleged claims against: all Defendants for unlicensed brokering of securities (Count One), sale of unregistered securities (Count Two), and fraud in the purchase and sale of securities (Count Three); Gary Soucy and K&M for consumer fraud (Count Four); K&M for breach of contract (Count Five); and Gary Soucy and spouse under a veil-piercing theory (Count Six).

¶5 The Defendants moved to compel arbitration based upon the Agreement's arbitration clause. After briefing, the trial court denied the Defendants' motion. Defendants appealed. We have jurisdiction under Arizona Revised Statutes ("A.R.S.") section 12-2101.01(A)(1).[1] After reviewing the opening and answering briefs, we requested supplemental briefing on *Dusold v. Porta-John Corp.,* 167 Ariz. 358, 807 P.2d 526 (App. 1990), and *County of Hawai'i v. UNIDEV, LLC*, 301 P.3d 588 (HI 2013).

## DISCUSSION

¶6 The Arizona Legislature adopted the Revised Uniform Arbitration Act ("AZ–RUAA"), which substantially mirrors the Revised Uniform Arbitration Act (amended 2000) ("Uniform Act") promulgated by the National Conference of Commissioners on Uniform State Laws. *See* A.R.S. §§ 12–3001 through –3029; *see also* Bruce E. Meyerson, *Arizona Adopts the Revised Uniform Arbitration Act*, 43 Ariz. St. L.J. 481 (2011). The AZ-RUAA applies to all arbitration agreements made after January 1, 2011. A.R.S. § 12-3003. Because the parties entered into the Agreement in June 2011, the AZ–RUAA applies to this case.

¶7 Under the AZ-RUAA, "[t]he court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate." A.R.S. § 12-3006(B). We review the interpretation of an arbitration clause de novo, *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593, ¶ 9, 218 P.3d 1045, 1050 (App. 2009), and the denial of a motion to compel arbitration de novo. *Nat'l Bank of Ariz. v. Schwartz,* 230 Ariz. 310, 311, ¶ 4, 283 P.3d 41, 42 (App. 2012) (citations omitted).

## I. Arbitration Agreement

¶8 Defendants first argue that a valid arbitration agreement exists even though Carey did not sign the Agreement. We agree. Even

---

[1] We cite to the current version of the statute unless otherwise noted.

though, as discussed, Carey did not sign the Agreement, Carey has not disputed the existence of the Agreement and its arbitration clause.[2]  *See* A.R.S. § 12-3006(A) ("[a]n agreement contained in a record to submit to arbitration . . . .").[3]  Moreover, a party who did not sign an agreement may be bound by the agreement if the party recognizes the validity and accepts performance of the agreement.  *See Modular Sys., Inc. v. Naisbitt,* 114 Ariz. 582, 585, 562 P.2d 1083 (App. 1977); *see also Nghiem v. NEC Elec., Inc.,* 25 F.3d 1437, 1439 (9th Cir. 1994) (an arbitration agreement must be in writing to be enforceable, but the parties need not sign it) (citations omitted).

## II.	Scope of the Arbitration Agreement

**¶9**	The arbitration clause in the Agreement provides that "[a]ny dispute arising under this Agreement must be resolved [b]y [the] American Arbitration Association in Phoenix, Arizona."  The parties' agreement determines the scope of the arbitration agreement.  *See Clarke v. Asarco, Inc.,* 123 Ariz. 587, 589, 601 P.2d 587, 589 (1979).  "Although it is commonly said that the law favors arbitration, it is more accurate to say that the law favors arbitration of disputes that the parties have agreed to arbitrate."  *S. Cal. Edison Co. v. Peabody W. Coal Co.,* 194 Ariz. 47, 51, ¶ 11, 977 P.2d 769, 773 (1999).  Arbitration clauses, as a result, are to be "construed liberally and any doubts as to whether or not the matter in question is subject to arbitration should be resolved in favor of arbitration."  *New Pueblo Constructors, Inc. v. Lake Patagonia Recreation Ass'n,* 12 Ariz. App. 13, 16, 467 P.2d 88, 91 (1970).

### a.	Brokering and Sale of Unregistered Securities

**¶10**	Describing the arbitration clause here as "broad," Defendants argue that it applies to all of Carey's claims, including Carey's brokering and sale of unregistered securities claims ("security claims").  Describing the arbitration clause as "narrow," however, Carey contends that it does not apply to these claims.

---

[2] He specifically alleged that the parties "had an enforceable contract created by an offer, acceptance and consideration."  And he alleged he fully performed by sending K&M $100,000 after receiving a draft of the Agreement, and subsequently received three monthly interest payments.

[3] Section 12-3001(6) defines a record as "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and that is retrievable in perceivable form."

¶11　　　　The AZ–RUAA does not address how the court should determine whether a dispute is subject to an arbitration clause. Because AZ–RUAA substantially mirrors the Uniform Act, we look to cases arising under the Uniform Act, its predecessor, the original Uniform Arbitration Act, and to the commentary for guidance. *See In re Estate of Dobert,* 192 Ariz. 248, 252, ¶ 17, 963 P.2d 327, 331 (App. 1998) (if an Arizona statute is based on a uniform act, courts assume the legislature "intended to adopt the construction placed on the act by its drafters[,]" and commentary to the uniform act is "highly persuasive unless erroneous or contrary to settled policy in this state") (quoting *State v. Sanchez,* 174 Ariz. 44, 47, 846 P.2d 857, 860 (App. 1993)) (internal quotation marks omitted). Section 12-3006, which defines the court's role in determining the validity of an arbitration agreement, mirrors the Uniform Act section 6. *Compare* A.R.S. § 12-3006, *with* Uniform Act § 6. Comment 2 to section 6 of the Uniform Act, provides that the section was:

> intended to incorporate the holdings of the vast majority of state courts and the law that has developed under the [Federal Arbitration Act ("FAA")] that, in the absence of an agreement to the contrary, issues of substantive arbitrability, *i.e.,* whether a dispute is encompassed by an agreement to arbitrate, are for a court to decide
> . . . .

¶12　　　　Although we are guided by case law examining the FAA, the Hawaiʻi Supreme Court recently noted that federal courts are split on whether language that requires the parties to arbitrate disputes "arising under" the agreement between them covers related torts. *See Cnty. of Hawaiʻi,* 301 P.3d at 595. The majority of federal courts have held that "arising under" language creates a general arbitration clause with a broad scope that includes related tort claims. *See, e.g., PRM Energy Sys., Inc. v. Primenergy, L.L.C.*, 592 F.3d 830, 836-37 (8th Cir. 2010) (arbitration provision containing "arising under" is a broad general arbitration clause that applied to tort claims including fraud, misappropriation of trade secrets, unfair competition, and tortious interference). A minority of courts, however, have held that "arising under" creates a narrow arbitration clause, which is limited to interpreting the contract. *See Mediterranean Enterprises, Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1464 (9th Cir. 1983) ("We have no difficulty finding that 'arising hereunder' is intended to cover a much narrower scope of disputes, i.e., only those relating to the interpretation and performance of the contract itself."). The Hawaiʻi Supreme Court, relying on the reasoning from the majority of federal courts, held that under Hawaiʻi's

Revised Uniform Arbitration Act an arbitration clause applying to "[a]ny dispute arising under the terms of this Agreement" is a broad general arbitration clause that covered related torts. *Cnty. of Hawai'i*, 301 P.3d at 591, 605-06. Defendants urge us to adopt the approach taken by the Hawai'i Supreme Court in interpreting the arbitration clause contained in the Agreement.

**¶13** In *Dusold*, we considered whether an arbitration clause that required the parties to arbitrate "any controversy or claim arising out of, or relating to this agreement, or the breach thereof" applied to the plaintiff's personal injury claim. 167 Ariz. at 359, 807 P.2d at 527. We explained that "in order for the dispute to be characterized as arising out of or related to the subject matter of the contract, and thus subject to arbitration, it must, at the very least, raise some issue the resolution of which requires a reference to or construction of some portion of the contract itself." *Dusold*, 167 Ariz. at 362, 807 P.2d at 530. Although the arbitration clause in *Dusold* is not the same as the clause in this case, Carey argues *Dusold* requires us to hold that his security claims are not subject to arbitration because an arbitration clause with "arising under" only applies to disputes raising an issue that "the resolution of which requires a reference to or construction of some portion of the contract itself." *See id.*

**¶14** But we do not need to resolve the parties' conflicting arguments. Even if we agree with Carey, his security claims require "a reference to or construction of some portion" of the Agreement. *See id.*

**¶15** Carey alleged that the Agreement was for the sale of securities. Defendants, however, contended that the Agreement was a debt instrument. Although under Arizona law a debt instrument can be a security, there are many exceptions, and whether a transaction involves a security depends on the circumstances, including the contractual arrangement and agreement between the parties. *See generally State v. Tober*, 173 Ariz. 211, 841 P.2d 206 (1992) (discussing applicable statutes and authorities). Accordingly, whether Carey purchased a security or a debt instrument, will require "reference to or construction of some portion" of the Agreement. *See Dusold*, 167 Ariz. at 362, 807 P.2d at 530; *see generally Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Properties, Inc. v. Robson*, 231 Ariz. 287, 293-94, ¶¶ 19-22, 294 P.3d 125, 131-32 (App. 2012) The arbitration clause therefore applies to Carey's security claims, Counts One and Two.

### b. Fraud and Consumer Fraud

¶16 Defendants also argue that the arbitration clause applies to Counts Three and Four, fraud in the purchase and sale of securities and consumer fraud. We agree. Counts Three and Four are within the scope of the arbitration clause because they allege Defendants made misrepresentations in the Agreement. *See U.S. Insulation, Inc. v. Hilro Const. Co.*, 146 Ariz. 250, 254 n. 3, 705 P.2d 490, 494 n. 3 (App. 1985). Moreover, like Carey's security claims, Carey alleges that the frauds occurred in the sale of a security. Thus, the court must look to the Agreement to resolve these claims.

### c. Breach of Contract

¶17 Although on appeal Carey agrees the arbitration clause applies to Count Five, the breach of contract claim, he argues that there is nothing to arbitrate because K&M admitted in its motion to compel arbitration that it breached the contract. We disagree.

¶18 Although K&M admitted that it had not repaid Carey the $100,000, it has yet to file an answer or to assert any potential affirmative defenses. And K&M averred in its motion to compel arbitration that Counts Three and Four, fraud and consumer fraud, are barred by the statute of limitations. *See* Ariz. R. Civ. P. 8(c) (a party must include affirmative defenses in a pleading to a preceding pleading). Moreover, even with K&M's admission that it did not return Carey's investment, an arbitrator will need to resolve any unpaid interest, as well as any attorneys' fees and costs.

¶19 K&M is entitled to have an arbitrator decide any affirmative defenses, damages, fees and costs. *See* A.R.S. § 12-3006(C); Uniform Act § 6 cmt. 2 ("issues of procedural arbitrability, *i.e.*, whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide."); *see also* A.R.S. § 12-3021(B) ("An arbitrator may award reasonable attorney fees and other reasonable expenses of arbitration only if that award is authorized by law in a civil action involving the same claim or by the agreement of the parties to the arbitration proceeding."). Therefore, the arbitration clause also applies to Count Five.

### d. Piercing the Corporate Veil

¶20 Carey also alleged that Gary Soucy was the alter ego of K&M. He claimed, as a result, that Gary Soucy was, legally speaking, K&M. *See*

*Deutsche Credit Corp. v. Case Power & Equip. Co.*, 179 Ariz. 155, 160, 876 P.2d 1190, 1195 (App. 1994) (alter ego status exists "when there is such a unity of interest and ownership that the separate personalities of the corporation and the owners cease to exist"). "When a plaintiff sues an individual under an alter ego theory, that defendant may demand arbitration to the same extent the corporate entities could do so." *Sun Valley Ranch*, 231 Ariz. at 296, ¶ 36, 294 P.3d at 134. Count Six is therefore subject to the arbitration clause.

### III.    Joseph Soucy and Randy Bronner

**¶21**        Finally, we must determine whether Carey also has to arbitrate his claims against Joseph Soucy and Randy Bronner, neither of whom were parties or signatories to the Agreement. Both, however, sought to compel arbitration of Carey's claims against them.

**¶22**        "[A] willing [nonsignatory] seeking to arbitrate with a signatory that is unwilling may do so under what has been called an alternative estoppel theory, which takes into consideration the relationships of persons, wrongs, and issues[.]" *Id.* at 296, ¶ 37, 294 P.3d at 134 (quoting *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003)) (internal citations omitted) (internal quotation marks omitted). A nonsignatory may compel arbitration when "the signatory's claims arise out of and relate directly to the written agreement . . . ." *Id.* at 297, ¶ 40, 294 P.3d at 135 (quoting *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005)) (internal quotation marks omitted). Likewise, a nonsignatory may compel arbitration when the signatory must rely on the contract and alleges "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories." *Id.* at 297, ¶ 40, 294 P.3d at 135 (quoting 4 Am. Jur. 2d *Alternative Dispute Resolution* § 60) (internal quotation marks omitted).

**¶23**        Here, Carey alleged that Joseph Soucy and Randy Bronner were also responsible for brokering and selling unregistered securities and fraud in the sale of those securities, Counts One through Three. He alleged that Bronner made the offer to sell K&M's securities and that Joseph Soucy, as well as Gary Soucy, influenced Bronner's and K&M's offer to sell securities. Carey, as a result, has alleged "substantial[] interdependent and concerted misconduct" by Joseph Soucy and Bronner, nonsignatories to the Agreement, with Gary Soucy and K&M. *See id.* Because Carey will still need to prove that the Agreement is a security and not a debt instrument to prevail on his claims against Joseph Soucy and Bronner, they can compel arbitration.

**ATTORNEYS' FEES**

**¶24** Carey requests an award of attorneys' fees and costs under A.R.S. §§ 12-341.01 and -341, and Arizona Rules of Civil Appellate Procedure 21. Because Carey is not the prevailing party, we deny his request.

**CONCLUSION**

**¶25** Based on the foregoing, we reverse the order denying arbitration and remand the case for the trial court to compel arbitration.



Ruth A. Willingham · Clerk of the Court
FILED: gsh