# STATE OF MICHIGAN

# COURT OF APPEALS

COASTAL COMMUNICATIONS OF
MICHIGAN, LLC, RICHARD C. WILLIAMSON,
and JOHN SECK,

        Plaintiff-Appellants,

v

AT&T SERVICES, INC., CHRISTOPHER D.
PORTER, JONATHAN BREIER, and
MATTHEW BURKETT,

        Defendant-Appellees.

UNPUBLISHED
March 29, 2016

No. 324241
Wayne Circuit Court
Business Court
LC No. 14-008682-CK

Before: STEPHENS, P.J., and HOEKSTRA and SERVITTO, JJ.

PER CURIAM.

Plaintiffs appeal as of right the trial court order granting defendants' motion for summary disposition under MCR 2.116(C)(7) based on there being an agreement to arbitrate between the parties. We affirm.

## I. BACKGROUND

Plaintiff Richard Williamson was president of Coastal Communications of Michigan, LLC (Coastal). Plaintiff John Seck was corporate representative of PRWC, LLC and later, co-owner of Coastal with Williamson. Defendants Christopher Porter, Jonathan Breier, and Matthew Burkett were employees of AT&T Mobility II, LLC (Mobility). Defendant AT&T Services, Inc. (AT&T Services) was a direct subsidiary of AT&T, Inc. and an AT&T affiliate of Mobility.

In late 2009, Williamson was contacted by Breier for Coastal to become a master dealer of AT&T cell phone sales and activations in Michigan. In November 2009, Williamson, on behalf of Coastal, and Brian Ducharme, vice president of Mobility, on behalf of Mobility and its licensed wireless affiliates, executed the 2009 "AT&T Exclusive Dealer Agreement." Under this contract, Coastal operated a business-to-business sales business where Coastal reopened retail stores that Mobility had closed as partnership locations with a local owner operator. The contract contained a provision for the arbitration of disputes, a merger clause and a Georgia

-1-

choice of law provision. On December 27, 2012, Williamson and Ducharme renewed the 2009 contract and extended Coastal's authorized dealer locations to Indiana.

On June 30, 2014, plaintiffs filed a Demand for Arbitration against Mobility with regard to the 2009 contract with the American Arbitration Association (AAA). The arbitration complaint alleged five counts: Breach of Contract (Count I) Fraudulent Misrepresentation (Count II) and Tortious Interference (Count V), and alternative counts of Promissory Estoppel (Count III) and Negligent Misrepresentation (Count IV).

In April 2011, Coastal entered into a contract with AT&T Services whereby Coastal would sell U-verse and certain other legacy products door-to-door. The 2011 contract was titled "Dealer Agreement between AT&T Services, Inc. and Coastal Communications of Michigan, LLC." This contract did not provide a provision for the arbitration of disputes, but did contain a merger clause and a Texas choice of law provision. The signatories to the 2011 contract were Williamson for Coastal and Mark L. Thompson for AT&T Services, Inc. Under the 2011 contract, Coastal was only authorized to market or sell services to customers or potential customers that were on Lead Lists provided to it by AT&T Services. The 2011 contract was terminated by letter in September 2013.

On July 7, 2014, just seven days after filing a complaint with the AAA, plaintiffs filed a complaint against AT&T Services and individual defendants Porter, Breier, and Burkett in circuit court in regards to the 2011 contract. The circuit court complaint alleged 11 counts: Breach of Contract against AT&T Services, Porter and Breier (Count I); Promissory Estoppel against AT&T Services, Porter and Breier (Count II); Fraudulent Misrepresentation and Statutory Fraud against Burkett, AT&T Services, Porter, and Breier (Count III); Negligent Misrepresentation against AT&T Services, Porter and Breier (Count IV); Interference with Existing Contracts and Business Relationships against Burkett, AT&T Services, Porter and Breier (Counts V - VII); Conspiracy against Porter and Brier (Count VIII); Misappropriation of Trade Secrets and Confidential Information against AT&T Services (Count IX); Quantum Meruit (Count X) against AT&T Services; and Statutory Conversion (Count XI) against AT&T Services.

In both the arbitration complaint and circuit court complaint, plaintiffs generally alleged that they were promised certain retail locations and commissions that never materialized.

Defendants filed a motion to summarily dispose of plaintiffs' circuit court complaint under MCR 2.116(C)(7) on August 7, 2014, arguing that "every aspect of the dispute alleged in Plaintiffs' Complaint is subject to a broad mandatory arbitration agreement." Plaintiffs responded to defendants' motion for summary disposition on September 29, 2014, arguing that summary disposition should be denied because "the causes of action alleged in Plaintiffs' Complaint are not subject to the arbitration provisions of the Dealer Agreement between AT&T Mobility II, Inc. and Coastal Communications of Michigan, LLC."

A motion hearing was held on October 6, 2014. The court granted defendants summary disposition on the record. The court determined that the parties in the 2009 and 2011contracts were the same: Coastal and AT&T and its affiliates. The court reasoned that the termination of the 2011 contract was a termination of additional services allowed under the 2009 contract, and that this explained how the 2011 contract terminated, but the 2009 contract with Mobility

survived. The court held that the 2011 contract "expanded the scope of the original Mobility" contract and did not revoke the arbitration clause contained in the 2009 contract, but became subject to it.

Plaintiffs now challenge the circuit court's dismissal of their claims and finding that an arbitration agreement existed between the parties.

## II. STANDARD OF REVIEW

Summary disposition under MCR 2.116(C)(7) is appropriate when there has been an agreement to arbitrate. *Maiden v Rozwood*, 461 Mich 109, 118-119 n 3; 597 NW2d 817 (1999). We review de novo a trial court's grant or denial of a motion for summary disposition under MCR 2.116(C)(7) to determine whether the moving party was entitled to judgment as a matter of law. *Watts v Polaczyk*, 242 Mich App 600, 603; 619 NW2d 714 (2000). "In reviewing a motion under MCR 2.116(C)(7), a court must consider all affidavits, pleadings, depositions, admissions, and documentary evidence filed or submitted by the parties." *Marrero v McDonnell Douglas Capital Corp*, 200 Mich App 438, 441; 505 NW2d 275, 277 (1993). "[T]he plaintiff's well-pleaded allegations are accepted as true and are construed in the plaintiff's favor." *Abbott v John E Green Co*, 233 Mich App 194, 198; 592 NW2d 96 (1998).

The existence and enforceability of an arbitration agreement is also reviewed de novo as a question of law. *Michelson v Voison*, 254 Mich App 691, 693–694; 658 NW2d 188 (2003). To determine whether an arbitration contract exists, we apply general contract principles. *Horn v Cooke*, 118 Mich App 740, 744-45; 325 NW2d 558 (1982).

> Under ordinary contract principles, if contractual language is clear, construction of the contract is a question of law for the court. If the contract is subject to two reasonable interpretations, factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. The language of a contract should be given its ordinary and plain meaning. [*Meagher v Wayne State Univ*, 222 Mich App 700, 721–722; 565 NW2d 401 (1997) (citations omitted).]

## III. ANALYSIS

Plaintiffs' argument against arbitration is that the 2009 and 2011 contracts are completely independent from each other. We disagree.

The 2009 Dealer agreement was Coastal's first contract with any AT&T entity. It established Coastal's business relationship with AT&T, Inc. and certain other entities that were defined and described in the contract. It provided the framework for the sale and promotion of AT&T, Inc. products and services at that time and in the future. The agreement, also, covered a broad range of services. The subject matter of the agreement was, "All communications (voice and data), broadband, or video services provided by the AT&T Affiliate, whether or not Dealer is authorized to sell these services." It also addressed the equipment used to provide those services

both by the signatories of the 2009 contract and other entities called affiliates. Affiliates were defined as "Company, its parent companies, and all of their subsidiaries and affiliates within the United States, which provide a wide variety of communications, broadband, and video services nationwide and own and control the AT&T brand and the intellectual property, trademarks, and service marks associated with these services." The contract included language regarding future agreements between the contract signatories and that same aggregate known as affiliates. Section 8.2 of the 2009 contract provides that the contract apply to any subsequent contract between Coastal and an AT&T affiliate for the distribution of AT&T services.

> 8.2 Distribution of AT&T Affiliate Services. Company may, in its sole discretion, offer Dealer the opportunity to distribute certain Services of one or more AT&T Affiliates under the terms and conditions of this Agreement and any supplemental terms and conditions issued by Company under this Agreement. If Dealer participates in distributing these Services, it must comply with any supplemental terms, conditions, restrictions, and sales quotas set forth by Company. Company may authorize Dealer to sell a specific AT&T Affiliate Service, but not permit other Services to be sold by Dealer. Company may also restrict the sale of AT&T Affiliate Service from specific Approved Retail Locations at Company's sole discretion.

Importantly, the contract also addressed the dispute resolution process for any disagreements arising from the 2009 contract.

According to both of plaintiffs' complaints, a series of contracts, both verbal and written, ensued between the signatories to the 2009 contract. In 2011, Coastal contracted with AT&T affiliate, AT&T Services. Although more lengthy than the 2009 contract, the subject matter of the 2011 contract was Coastal's participation in AT&T, Inc.'s National Dealer Program. The contract term was eight months, from April 7, 2011 to December 31, 2011. The parties did not execute a written extension but continued to operate under the other substantive terms of the contract until a termination letter was issued in September 2013. The 2011 contract contained supplemental terms and conditions specific to the distribution of the services involved. The 2011 contract did not contain any specific language referencing or incorporating the 2009 contract. It did not contain an arbitration clause or a provision for the handling of disputes. However, none of the other terms of the 2011 contract contradicted the terms and conditions of the 2009 contract, save for a choice of law provision. Where the choice of law for the 2009 contract was Georgia, the choice of law for the 2011 contract was Texas.

Plaintiffs' arguments that the 2011 contract is independent from, and cannot be controlled by the 2009 contract arbitration clause are unavailing. The 2011 contract between Coastal and AT&T Services was clearly a later opportunity for Coastal to distribute services from an AT&T affiliate as discussed in section 8.2 of the 2009 contract. Coastal began selling AT&T, Inc. products at approved retail stores under the 2009 contract. When Coastal later elected to sell U-verse and Legacy products door-to-door under the 2011 contract, it had to comply with the "supplemental terms, conditions, restrictions, [and] sales quotas set forth" in that contract yet, it was not absolved from the broad conditions in its master agreement with Mobility. It is true that the signatories between the 2009 and 2011 contracts were different. However, the parties agree that both Mobility and AT&T Services are subsidiaries of AT&T, Inc. and affiliates of one

-4-

another. Because AT&T Services was an affiliate, its contract with Coastal was subject to section 8.2 of the 2009 contract to the extent that provision was not specifically modified. Accordingly, the circuit court did not err in finding an agreement to arbitrate between the parties.

However, the court did not address which choice of law provision would apply for arbitration or the effect of the 2011 contract's integration clause.

"It is undisputed that Michigan's public policy favors the enforcement of contractual ... choice-of-law provisions." *Robert A Hansen Family Trust v FGH Indus, LLC*, 279 Mich App 468, 476; 760 NW2d 526 (2008). Parties are free to agree that all causes of action regarding a particular matter will be subject to the law of a particular jurisdiction. *Offerdahl v Silverstein*, 224 Mich App 417, 419; 569 NW2d 834 (1997). Here the 2009 contract contains a Georgia choice of law provision and the 2011 contract contains a Texas choice of law provision. The 2011 contract also contains an integration clause. "Where a binding agreement is integrated, it supersedes inconsistent terms of prior agreements and previous negotiations to the extent that it is inconsistent with them." *Ditzik v Schaffer Lumber Co,* 139 Mich App 81, 88; 360 NW2d 876 (1984).

> When there are several agreements relating to the same subject matter, the intention of the parties must be gleaned from all the agreements. If parties to a prior agreement enter into a subsequent contract that completely covers the same subject, but the second agreement contains terms that are inconsistent with those of the prior agreement, and the two documents cannot stand together, the later document supersedes and rescinds the earlier agreement. [*Omnicom of Michigan v Giannetti Investment Co,* 221 Mich App 341, 346-347; 561 NW2d 138 (1997) (citations omitted).]

Although the 2009 contract covers a broader range of topics than the 2011 contract, both cover the sale of AT&T, Inc. products and services. The only inconsistent term between the two contracts is the choice of law provision. Because of the integration clause in the 2011 contract, the inconsistent 2009 choice of law provision is superseded. Thus, Texas law applies to the further determination of whether Coastal's claims fall within the scope of the arbitration clause and whether Coastal can be compelled to arbitrate its claims against individual defendants Porter, Breier and Burkett.

9 USC § 2, the Federal Arbitration Act (FAA), 9 USC § 1 *et seq.*, is also implicated because this case involves a "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction[,] . . ."

> The "principal purpose" of the FAA is to ensur[e] that private arbitration agreements are enforced according to their terms. This purpose is readily apparent from the FAA's text. Section 2 makes arbitration agreements "valid, irrevocable, and enforceable" as written (subject, of course, to the saving clause); § 3 requires courts to stay litigation of arbitral claims pending arbitration of those claims "in accordance with the terms of the agreement"; and § 4 requires courts to compel arbitration "in accordance with the terms of the agreement" upon the motion of either party to the agreement (assuming that the "making of the

arbitration agreement or the failure ... to perform the same" is not at issue). In light of these provisions, we have held that parties may agree to limit the issues subject to arbitration, to arbitrate according to specific rules, and to limit with whom a party will arbitrate its disputes. [*AT&T Mobility LLC v Concepcion*, 563 US 333, 344; 131 S Ct 1740, 1748-49; 179 L Ed 2d 742 (2011) (internal citations and quotation marks omitted).

Under Texas law, "when a right to arbitration is claimed under the Federal Act, whether the dispute is subject to arbitration is determined under federal law." *In re Sun Communications, Inc*, 86 SW3d 313, 317 (Tex App 2002). "Arbitration is heavily favored under federal and state law and should not be denied unless it can be said with positive assurance that the arbitration clause cannot be interpreted so as to encompass the dispute in question." *Id*. "The resisting party bears the burden of showing that its claims are not subject to arbitration." *Id*. at 318.

" '[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he had not agreed so to submit.' " *AT & T Techs, Inc v Commc'n Workers of Am*, 475 US 643, 648; 106 S Ct 1415; 89 L Ed 2d 648 (1986) (citations omitted). Therefore, "the basic objective in this area is ... to ensure that commercial arbitration agreements, like other contracts, ' "are enforced according to their terms," ' and according to the intentions of the parties." *First Options of Chicago, Inc v Kaplan*, 514 US 938, 947; 115 S Ct 1920; 131 L Ed 2d 985 (1995) (citations omitted).

In order to be arbitrable, plaintiffs' claims must fall within the scope of the 2009 arbitration provision. "In determining whether a claim falls within the scope of an arbitration agreement, we focus on the factual allegations of the complaint, rather than the legal causes of action asserted." *Prudential Sec Inc v Marshall*, 909 SW2d 896, 900 (Tex 1995). "We consider whether the facts alleged are intertwined with the contract containing the arbitration clause. To be within the scope of an arbitration provision, the allegations need only be factually intertwined with arbitrable claims or otherwise touch upon the subject matter of the agreement containing the arbitration provision." *In re Prudential Sec, Inc*, 159 SW3d 279, 283 (Tex App 2005) (internal citations omitted). "If [a] party establishes that the dispute falls within the scope of a valid arbitration agreement, a trial court must order the parties to arbitrate." *In re Sun Communications, Inc*, 86 SW3d at 317. "A broad arbitration clause gives rise to a presumption in favor of arbitration." *Id*. at 318. "Any doubt as to whether a dispute falls within the scope of an arbitration clause is resolved in favor of arbitration." *Id*.

The 2009 arbitration clause reads in pertinent part as follows:

**11.4.1 Arbitration Clause.** If the parties are unable to resolve the Dispute under the mandatory dispute resolution procedures above, then, except as stated in section 11.4.4 [Right to Seek Injunction] of this Agreement, these unresolved Disputes (including without limitation counterclaims and cross-claims and also including claims based on tort or other legal theories) between Dealer and Company must be resolved by submission to binding arbitration. The parties understand that they are waiving all right to a jury trial, even if this arbitration clause is found to be inapplicable or invalid, in which case a judge must decide the Dispute. The parties must submit any unresolved Disputes to the American

Arbitration Association ("AAA") location nearest to Dealer within the Area to be decided under the then current AAA commercial arbitration rules, as modified by this Agreement. . . .

The clause applies to unresolved "Disputes." A "Dispute" is defined in the contract as "any controversy, claim, grievance, or dispute that Dealer may have regarding this Agreement or its relationship with Company." Section 11.1.

The 2009 arbitration provision is broad. Under it, arbitrable disputes are *any* regarding the 2009 contract *or* Dealer's relationship with Company. An arbitration provision with language applying the arbitration requirement to 'any dispute' is considered broad. *Ascendant Anesthesia PLLC v Abazi*, 348 SW3d 454, 461 (Tex App 2011). "Where an arbitration clause is broad and the particular grievance sought to be excluded is not expressly excluded by such clause, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id*. (Citation and quotation marks omitted).

Any claim that plaintiffs' circuit court claims are independent from their arbitration claims is untenable given that the general allegations from both complaints are nearly identical. Both complaints primarily name the same individuals, Williamson, Seck, Porter, Brier, and Purkett, and the same series of events, Coastal was to take over certain stores and receive certain commissions and those events did not happen as promised. The arbitration claims and circuit court claims are factually intertwined and dependent of one another.

The arbitration complaint alleged breach of contract, fraudulent misrepresentation, and tortious interference, with alternative counts of promissory estoppel and negligent misrepresentation. Similarly, the circuit court complaint alleged breach of contract, promissory estoppel, fraudulent misrepresentation and statutory fraud, negligent misrepresentation, interference with existing contracts and business relationships, conspiracy, misappropriation of trade secrets and confidential information, quantum meruit, and statutory conversion. There was no reason for plaintiffs to omit their circuit court complaint allegations from their arbitration complaint. First, plaintiffs could not evade stating in their circuit court complaint how the 2011 contract originated: from its relationship with Mobility and its understanding that AT&T, Inc. wanted to expand its presence in Michigan. Similarly, plaintiffs' circuit court breach of contract and promissory actions, alleging breaches and unfulfilled promises under the 2011 contract, necessarily relate back to the 2009 contract because the 2011 contract was a contract for the distribution of services by an AT&T affiliate contemplated by and subject to the terms of the 2009 contract. Plaintiffs' circuit court allegations against Porter, Breier, and Burkett in their individual capacities also arise from the 2009 contract. Williamson was allegedly approached by Breier to purchase AT&T phones directly while Coastal was operating retail stores under the 2009 contract. Plaintiffs' circuit court complaints of breaches of contract and misrepresentation relating to spifs and commissions that were promised by Porter and Breier, but never received also derive from the 2009 contract. The promises were allegedly made to induce Coastal to continue to operate retail stores it took over under the 2009 contract that Coastal threatened to close due to lack of performance. The same events that led to plaintiffs' circuit court counts of estoppel and tortious interference against Porter and Breier, namely the merger with PRWC and the sale of plaintiffs' Grand Rapids store to Brightlinks, were also relied on in plaintiffs' arbitration complaint. Significantly, Porter, Breier, and Burkett were at all times employees of

Mobility. Plaintiffs' circuit court complaint states that plaintiffs entered into the 2011 contract after being approached by Burkett, a Mobility employee. It is clear, from a reading of both the arbitration and circuit court complaints, that there was an ongoing relationship between Coastal and AT&T, Inc. through its affiliated companies, and that plaintiffs have selected facts of that relationship to create two complaints, resulting in a circuit court complaint that is a rewording of the arbitration complaint. Regardless of their effort, plaintiffs cannot make out the claim that the disputes alleged in their circuit court complaint are independent from those in the arbitration complaint. Accordingly, because the disputes alleged in the circuit court complaint cannot be maintained without reference to the 2009 contract, they are subject to arbitration as provided in the 2009 contract. Given the broad language of the arbitration clause and the absence of any language excluding certain claims, even in the renewal of the 2009 contract, we conclude that plaintiffs' circuit court complaints are arbitrable.

Plaintiffs also argue that they should be able to plead their allegations against individual defendants Porter, Breier, and Burkett in circuit court because these defendants were not signatories to the 2009 contract. We disagree and conclude that plaintiffs are estopped from bifurcating their claims between arbitration and the circuit court. "Texas law favors the joint resolution of multiple claims to prevent multiple determinations of the same matter." *In re Prudential Securities,* 159 SW3d at 283. Further, "parties to an arbitration agreement may not evade arbitration through artful pleading, such as by naming individual agents of the party to the arbitration clause and suing them in their individual capacity." *In re Merrill Lynch Trust Co FSB*, 235 SW3d 185, 188 (Tex 2007) (citation omitted). "As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts." *In re Vesta Ins Group Inc*, 192 SW3d 759, 762 (Tex 2006). Again, Breier, Burkett and Porter were at all times Mobility employees. In *In re Vesta*, the Supreme Court of Texas reasoned that "corporations must act through human agents" and "[i]f arbitration clauses only apply to contractual signatories, then . . . every officer and agent (and every affiliate and its officers and agents) [would have to] either sign the contract or be listed as a third-party beneficiary." *Id*. According to the Texas Court, the result would be to place such clauses on an unequal footing with others in a corporate contract. *Id*.

As discussed, plaintiffs' claims against non-signatories Porter, Breier and Burkett are dependent upon the business relationship plaintiffs established under the 2009 contract. "A willing nonsignatory seeking to arbitrate with a signatory that is unwilling may do so under what has been called an alternative estoppel theory which takes into consideration the relationships of persons, wrongs, and issues ...' " *Merrill Lynch Inv Managers v Optibase, Ltd*, 337 F3d 125, 131 (2d Cir 2003) (alteration omitted, emphasis added). Similar to equitable estoppel, "[a]lternative estoppel typically relies, at least in part, on the claims being so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement." *PRM Energy Sys, Inc v Primenergy, LLC*, 592 F3d 830, 835 (CA 8 2010). Here again, it can be said that plaintiffs' claims under the circuit court complaint are "so intertwined with the contract containing the arbitration clause that it would be unfair to allow" plaintiffs to rely on the 2009 contract to lay the foundation for their claims, then ask this Court not to apply the same contract's provision to arbitrate.

Accordingly, we conclude that plaintiffs' circuit court complaints are subject to arbitration under the 2009 contract, but that the 2011 contract's choice of law provision applies to the arbitration of those disputes.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Joel P. Hoekstra
/s/ Deborah A. Servitto