SHEPHERD, Circuit Judge.
Appellants are five retail grocers (“the Retailers”), each attempting to bring class-action antitrust claims against one of two wholesale grocers (“the Wholesalers”). Each Retailer is a customer of only one of the 'Wholesalers, has an arbitration agreement with only that Wholesaler, and is attempting to use an antitrust conspiracy theory to bring suit against the Wholesaler with whom it neither does business nor has an arbitration agreement (“the non-signatory Wholesaler”). The district court dismissed the Retailers’ claims and struck their allegations from the complaint in the ongoing[1] lawsuit, holding that equitable estoppel bars the Retailers from bringing suit against the non-signatory Wholesaler and allows the non-signatory Wholesaler to compel arbitration. The district court certified this as a final judgment under Federal Rule of Civil Procedure 54(b). In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, 2011 WL 3837107, at *4 (D.Minn. Aug. 30, 2011) (unpublished). We have jurisdiction under 28 U.S.C. § 1291. We reverse the district court’s ruling that equitable estoppel bars the Retailers from asserting antitrust claims in federal court, and we remand for further proceedings.
*920 I.
Appellants Blue Goose Super Market, Inc. (“Blue Goose”), Millennium Operations, Inc. (“Millennium”), and King Cole Foods, Inc. (“King Cole”) all have supply and arbitration agreements with Appellee SuperValu, Inc. (“SuperValu”). Appellants JFM Market, Inc. and MJF Market, Inc. (collectively “the Village Markets”) both have supply and arbitration agreements with Appellee C & S Wholesale Grocers, Inc. (“C & S”).[2] The parties all agree that the Retailers’ supply agreements with the Wholesalers do not specify price terms. Millennium’s supply agreement with SuperValu specifies Millennium will purchase a certain percentage of its requirements from SuperValu. The other Retailers’ supply agreements do not contain requirements provisions, but rather generally state that the Wholesaler named in the agreement will make products available and that the Retailer named in the agreement will pay the prices stated on any future sales documents. The arbitration agreements accompanying[3] the supply agreements all generally specify that the signatories will arbitrate any disputes between them.
In September 2003, C & S and SuperVa-lu entered into an Asset Exchange Agreement (“AEA”) in which they exchanged certain business assets, including some customer contracts, and agreed not to do business with or solicit any of the exchanged customers for a certain time period. Some, but not all, of the Retailers’ supply and arbitration agreements were among the contracts exchanged as part of the AEA.
After the AEA, all of the Retailers purchased goods from the Wholesaler with whom they had a supply and arbitration agreement (“the signatory Wholesaler”). Each Retailer subsequently brought class-action antitrust claims in federal district court. In an effort to avoid arbitration, each Retailer brought claims only against the Wholesaler with whom they did not have a supply and arbitration agreement. Thus, Blue Goose, Millennium, and King Cole, who had contracts and did business only with SuperValu during the class period, brought antitrust claims only against C & S. Likewise, the Village Markets, who had contracts and did business only with C & S during the class period, brought antitrust claims only against SuperValu. The Retailers alleged that the AEA amounted to an illegal antitrust conspiracy between the Wholesalers in violation of the Sherman Act, 15 U.S.C. § 1, artificially inflating prices and causing each Retailer to overpay for their wholesale grocery purchases.
The Wholesalers moved to dismiss the Retailers’ antitrust claims. The Wholesal *921 ers argued that the doctrine of either equitable estoppel or successor-in-interest allowed the non-signatory “Wholesaler to enforce the signatory Wholesaler’s arbitration agreements with the Retailers, thus requiring the Retailers to arbitrate their antitrust claims against the non-signatories. The Retailers responded that neither the equitable estoppel doctrine nor the successor-in-interest doctrine compelled them to arbitrate, and further argued that even if one of those doctrines did apply, the arbitration agreements were unenforceable for public policy reasons.
The district court granted the Wholesalers’ motion to dismiss the Retailers’ claims from the putative class action. In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, slip op. at 11, 2011 WL 9558054 (D.Minn. July 5, 2011). First, the court held that the non-signatory Wholesaler could invoke equitable es-toppel to compel the Retailers to arbitrate their antitrust claims. Id. at 6. Second, the court held that the arbitration agreements were enforceable. Id. at 10. Because the district court held the Wholesalers could use equitable estoppel to compel arbitration, the court did not address the Wholesalers’ argument that they could enforce the arbitration agreements as successors-in-interest. The Retailers brought the present appeal.
II.
A.
The first issue on appeal is whether the non-signatory Wholesalers can use equitable estoppel to compel the Retailers to arbitrate their antitrust claims. “Where a district court grants arbitration, its application of equitable estoppel presents at least mixed questions of law and fact. In this circuit, mixed questions of law and fact are reviewed de novo.” Donaldson Co. v. Burroughs Diesel, Inc., 581 F.3d 726, 731 (8th Cir.2009). Upon de novo review, we hold that the non-signatory Wholesalers cannot use equitable estoppel to compel arbitration.
As a preliminary matter, “state contract law governs the ability of nonsig-natories to enforce arbitration provisions.” PRM Energy Sys., Inc. v. Primenergy, L.L.C., 592 F.3d 830, 833 (8th Cir.2010) (internal quotation marks omitted). The parties agree that Minnesota law applies here.[4] The only Minnesota Supreme Court case mentioning equitable estoppel in the arbitration context is Onvoy, Inc. v. SHAL, LLC, 669 N.W.2d 344 (Minn.2003). In that case, the court stated the general rule that “arbitration clauses are contractual and cannot be enforced by persons who are not parties to the contract.” Id. at 356. The court then explained that equitable estoppel is an exception to the rule and “prevents a signatory from relying on the underlying contract to make his or her claim against the nonsignatory.” Id. The court did not reach the issue of whether equitable estoppel applied, however, because it remanded the ease on other grounds. Id. at 357. One unpublished Minnesota Court of Appeals case has evaluated when equitable estoppel applies in the arbitration context,[5] but Minnesota law specifies that unpublished cases are not *922 precedential. Minn.Stat. § 480A.08(3)(c). Minnesota appears to follow federal law regarding equitable estoppel. See Onvoy, 669 N.W.2d at 356 (“Federal cases have set out at least three principles on which a nonsignatory to a contract can compel arbitration: equitable estoppel, agency, and third-party beneficiary.” (citing MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir.1999), abrogated on other grounds by Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009))). Since we do not have any published Minnesota cases applying equitable estoppel, and since Minnesota appears to follow federal law regarding equitable estoppel, we look to federal law here.[6]
We addressed the doctrine of equitable estoppel in PRM Energy Systems. In that case, we explained:
[Equitable] estoppel[7] typically relies, at least in part, on the claims being so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement.
PRM Energy Sys., 592 F.3d at 835 (footnote added). A non-signatory can “force a signatory into arbitration under the [equitable] estoppel theory when the relationship of the persons, wrongs and issues involved is a close one.” CD Partners, LLC v. Grizzle, 424 F.3d 795, 799 (8th Cir.2005). For example, as relevant to the instant case, equitable estoppel applies when a complaint involves “allegations of pre-arranged, collusive behavior demonstrating that the claims are intimately *923 founded in and intertwined with the agreement at issue.” PRM Energy Sys., 592 F.3d at 835 (internal quotation marks omitted). In contrast, merely alleging that a non-signatory conspired with a signatory is insufficient to invoke equitable estoppel, absent some “intimate[ ] ... and intertwined” relationship between the claims and the agreement containing the arbitration clause. PRM Energy Systems, 592 F.3d at 835.
Examining the facts of cases applying our equitable estoppel test is instructive. First, in CD Partners, CDWI and C.D. Partners signed franchise agreements containing arbitration clauses. 424 F.3d at 797. C.D. Partners later sued three of CDWI’s chief executives for negligence, negligent misrepresentation, and fraudulent misrepresentation in connection with their operation of the franchises. Id. The three executives moved to compel arbitration, and the district court denied their motion. Id. at 798. We reversed, holding, in relevant part, that the “dispute between signatory C.D. Partners and [the three non-signatory chief executives] arises out of and relates directly to the contractual agreement between the signatories, where the core of the dispute is the conduct of the three nonsignatories in fulfilling signatory CDWI’s promises.” Id. at 800.
Second, in PRM Energy Systems, PRM had a contract with Primenergy that granted Primenergy a license to use some of PRM’s technology and also allowed Pri-menergy to enter into sublicense agreements with third parties. 592 F.3d at 832. The contract contained an arbitration clause. Id. Primenergy allegedly conspired with a third party, the Japan-based company Kobe Steel, to violate the terms of that contract. Id. More specifically, although the contract specified Primener-gy could not sublicense PRM’s technology to companies in Japan, Primenergy and Kobe Steel allegedly entered into such a sublicense agreement. Id. PRM brought suit against non-signatory Kobe Steel for tortious interference and conspiracy, and Kobe Steel moved to compel arbitration. Id. at 833. The district court granted Kobe Steel’s motion on the basis of equitable estoppel, and we affirmed. Id. We explained that equitable estoppel applied because the case involved allegations of violation of the terms of the agreement containing the arbitration clause, and because that agreement “anticipated that an entity such as Kobe Steel might enter into a licensing relationship with Primenergy, and the [agreement] attempted to govern that expected relationship.” Id. at 836.
Applying this precedent, we hold that the Retailers’ claims against the non-signatory Wholesalers are not “so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement.” Id. at 835. In both PRM Energy Systems and CD Partners, the plaintiffs’ claims arose directly from violations of the terms of a contract containing an arbitration clause. See PRM Energy Sys., 592 F.3d at 832-33; CD Partners, 424 F.3d at 797. Without the contracts in those cases, the plaintiffs would not have had a cause of action. In contrast, the Retailers are bringing antitrust conspiracy claims against the non-signatory Wholesalers. These statutory claims exist independent of the supply and arbitration agreements. See 15 U.S.C. § 1 (“Every ... conspiracy[ ] in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.”); 15 U.S.C. § 15 (“[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue *924 therefor....”)- Moreover, the Retailers’ antitrust claims are premised on paying artificially inflated prices, but since none of the Retailers’ contracts with the Wholesalers specify price terms, the Retailers’ claims do not involve alleged violation of any terms of those contracts. Nor is there any evidence, as there was in PRM Energy Systems, that the contracts explicitly anticipated a signatory would enter into the type of relationship with a non-signatory — here, the relationship being that of antitrust co-conspirators — that ultimately gave rise to the claims. Under these circumstances, we cannot say that the Retailers’ claims “rely on”[8] and have an “intimate[ ] ... and intertwined” relationship with the contracts such that equitable estoppel should apply. See PRM Energy Sys., 592 F.3d at 835 (internal quotation marks omitted).
In holding that equitable estoppel permits the non-signatory Wholesaler to compel arbitration here, the district court reasoned, “The agreements to arbitrate ... are a fundamental component of the entire wholesaler-retailer relationship between the signatories.... This is precisely the relationship that is at issue in this litigation.” In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, slip op. at 6, 2011 WL 9558054 (D.Minn. July 5, 2011). The court further reasoned that “the existence of the agreements to arbitrate is presumed by the claims asserted by the [Retailers] because without the agreements no wholesaler-supplier relationship would exist to be exploited by the alleged anti-trust conspiracy....” Id. at 7. This analysis, however, focuses too much on the relationship between the signatories, rather than on the relationship between the signatory’s claims against the non-signatory and the contract containing the arbitration clause.[9] As explained above, these antitrust conspiracy claims do not involve violation of the terms of the contract, the face of the contract does not provide the basis for the alleged injuries, and there is no evidence that the contract anticipated the precise type of relationship giving rise to the claims. Thus, the requisite relationship is lacking here.
B.
Although we hold that the non-signatory Wholesalers cannot use equitable estoppel to compel the Retailers to arbitrate their antitrust claims, this does not fully resolve the question of whether the non-signatory Wholesalers can compel any of the Retailers to arbitrate. The non-signatory Wholesalers also argue they can enforce *925 Millennium’s and the Village Market’s arbitration agreements as sueeessors-in-in-terest because those agreements were exchanged as part of the AEA.[10] Since the district court found the equitable estoppel issue dispositive, it did not address the successor-in-interest argument. Accordingly, we remand for the district court to consider this argument in the first instance. See Alliant Techsystems, Inc. v. Marks, 465 F.3d 864, 873 (8th Cir.2006) (“Because the district court did not decide the merits of these claims, which are heavily fact-based, we decline to consider them in the first instance.”).
C.
Finally, King Cole and the Village Markets argue that even if the non-signatory Wholesaler can compel arbitration, the arbitration agreements are unenforceable for public policy reasons.[11] With respect to King Cole, this argument is moot because we have held that C & S cannot use equitable estoppel to compel arbitration, and C & S does not make the alternative argument that it can enforce the arbitration agreement as a successor-in-interest. With respect to the Village Markets, this argument is relevant only if the district court finds that SuperValu can enforce the arbitration agreement as a successor-in-interest. Since we are remanding for the district court to consider the successor-in-interest argument, we decline to reach the Village Markets’ public policy argument as we would risk issuing an advisory opinion. See United States v. Tyerman, 641 F.3d 936, 936 n. 2 (8th Cir.2011) (declining to reach remaining issues “because it is unknown if and how this case will proceed on remand”).
III.
Accordingly, we reverse the district court’s holding that the non-signatory Wholesalers can enforce the Retailers’ arbitration agreements based on the doctrine of equitable estoppel. We remand for further proceedings consistent with this opinion.

. After the Retailers were dismissed from the lawsuit and filed this appeal, the district court denied class certification to the plaintiffs remaining in the lawsuit. In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, 2012 WL 3031085, at *17 (D.Minn. July 25, 2012) (unpublished). The district court later granted summary judgment in favor of the Wholesalers on the remaining plaintiffs’ claims. In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, 2013 WL 140285, at *16 (D.Minn. Jan. 11, 2013) (unpublished). As of February 7, 2013, one of these plaintiffs has filed a notice of appeal of both orders.

. The district court noted that the Village Markets actually executed arbitration agreements with SuperValu, that those agreements later were assigned to C & S, and that the Village Markets disputed the validity of the assignment. In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, slip op. at 4 n. 3, 2011 WL 9558054 (D.Minn. July 5, 2011). On appeal, the Village Markets have stated that their contracts "were transferred to C & S, as the District Court found.” King Cole Br. 11. Whether the transfer constituted a valid assignment is a separate issue that we do not address on this appeal.

. The parties agree that the supply agreements and the arbitration agreements are actually separate documents — i.e., that each Retailer is a signatory both to a supply agreement and to an arbitration agreement. The Wholesalers state this in their brief, Ap-pellees' Br. 7, 11-13, as do Blue Goose and Millennium, Blue Goose Br. 6-7. King Cole and the Village Markets imply the same in their brief, see King Cole Br. 10-12 (referring to "arbitration agreements” rather than to "arbitration clauses”), and in any event, they do not dispute the Wholesalers' assertion.

. C & S, Supervalu, Blue Goose, and Millennium explicitly state that Minnesota law applies. See Appellees' Br. 21; Blue Goose Br. 18. King Cole and the Village Markets seem to agree, see King Cole Reply Br. 7 (referencing Minnesota law), and in any event, they do not dispute the assertion.

. In ev3, Inc. v. Collins, No. A08-1816, A08-1901, 2009 WL 2432348, at *1 (Minn.Ct.App. Aug. 11, 2009) (unpublished), the Minnesota Court of Appeals upheld a trial court’s denial of a motion to compel arbitration based on equitable estoppel. The dissent suggests we follow ev3 ’s analytical approach because "it *922 provides a persuasive indication of how the Minnesota Supreme Court would apply equitable estoppel.” Infra at 927. It is true that we may look to intermediate appellate court decisions as persuasive authority "when they are the best evidence of what state law is.” Minn. Supply Co. v. Raymond. Corp., 472 F.3d 524, 534 (8th Cir.2006). As explained in section 11(A) of our opinion, however, our circuit has developed an approach to equitable estop-pel that is based on a different interpretation of the same case analyzed in ev3 and cited in the Minnesota Supreme Court’s Onvoy opinion&emdash;namely, MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942 (11th Cir.1999), abrogated on other grounds by Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009). See infra at 924 n. 8. Moreover, while the ev3 court did state that "the principles of equitable estoppel could be applied” to compel arbitration in that case, the court ultimately upheld the district court's decision not to compel arbitration due to the standard of review. ev3, 2009 WL 2432348, at *6-7. Thus, given the Minnesota Supreme Court’s explicit reference in Onvoy to federal law on this issue, a single non-precedential case which did not ultimately compel arbitration is not a persuasive predictor of how the Minnesota Supreme Court would rule.

. Several cases cited in the parties' briefs explicitly apply the law of states other than Minnesota and thus are inapposite. See Simmons Foods, Inc. v. H. Mahmood I. Al-Bunnia & Sons Co., 634 F.3d 466, 469 (8th Cir.2011) (Arkansas law); Lawson v. Life of the S. Ins. Co., 648 F.3d 1166, 1171 (11th Cir.2011) (Georgia law); Donaldson, 581 F.3d at 732 (Mississippi law).

. In cases such as PRM Energy Systems, we have used the term "alternative estoppel” to refer to the "intertwined with the agreement” theory of when a non-signatory can compel arbitration. See PRM Energy Sys., 592 F.3d at 834-35. We did so to distinguish this theory from a theory that "relies on agency and related principles to allow a nonsignatory to compel arbitration when, as a result of the nonsignatory’s close relationship with a signatory, a failure to do so would eviscerate the arbitration agreement.” Id. at 834. Since the district court, the parties’ briefs, and the Minnesota Supreme Court use the term "equitable estoppel,” see Onvoy, 669 N.W.2d at 356, we use that term here.

. The Wholesalers argue that it is irrelevant whether the Retailers' antitrust claims rely on the terms of the contracts containing the arbitration clause. Appellees’ Br. 31-34. Specifically, they argue that under MS Dealer, the Eleventh Circuit case cited in the Minnesota Supreme Court's Onvoy opinion, see Onvoy, 669 N.W.2d at 356, reliance is unnecessary when the complaint involves allegations of concerted misconduct between a signatory and non-signatory. Appellees’ Br. 31-32 (citing MS Dealer, 177 F.3d at 947). However, in both PRM Energy Systems and CD Partners, we relied heavily on MS Dealer. See PRM Energy Sys., 592 F.3d at 834-36; CD Partners, 424 F.3d at 798. Thus, CD Partners and PRM Energy Systems involved our interpretation of MS Dealer, and we do not believe a different result would be warranted under that case.

. Similarly, the dissent's analysis erroneously focuses on the terms of the contractual relationship established between the signatories to the arbitration agreements. See infra at 925-27. The issue in this case, however, is not the contractual relationship between the signatories. Rather, the issue is whether the signatory’s claims against the non-signatory are of such a nature that the non-signatory should be able to compel arbitration pursuant to the terms of the contract between the signatories, even though the non-signatory was not a party to that contract.

. The Wholesalers do not make this argument with respect to Blue Goose or King Cole.

. Neither Millennium nor Blue Goose makes this argument. In any event, the argument would be moot with respect to Blue Goose since we have held C & S cannot use equitable estoppel to compel arbitration, and C & S does not make the alternative argument that it can enforce the arbitration agreement as a successor-in-interest.