# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1786

_____

In re: Wholesale Grocery Products Antitrust Litigation

------------------------------

Millennium Operations, Inc.; JFM Market, Inc.; MJF Market, Inc.

*Plaintiffs - Appellees*

v.

SuperValu, Inc.; C&S Wholesale Grocers, Inc.

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 17, 2016
Filed: March 1, 2017

_____

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

A number of retail grocers sued two large full-line wholesale grocers, alleging the wholesalers' contract to exchange retailer supply agreements constituted market allocation in violation of the Sherman Act, see 15 U.S.C. § 1. The retailers formed

two putative classes, the Midwest Class and the New England Class. Each class had an Arbitration Subclass of retailers who had arbitration agreements with their current (post-swap) wholesaler. Each Arbitration Subclass sued only its previous wholesaler, with which it no longer had a current arbitration agreement. The district court[1] dismissed the Arbitration Subclasses from the case on the theory that the previous wholesalers, as "nonsignatory" defendants, could compel the retailers to arbitrate based on equitable estoppel. See In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090, 2011 WL 9558054, at *3-4 (D. Minn. July 5, 2011).

We reversed and then remanded for the district court to consider the wholesalers' alternate theory that the nonsignatory defendants could compel arbitration because they were successors-in-interest to the signatory defendants. See In re Wholesale Grocery Prods. Antitrust Litig., 707 F.3d 917, 919-20, 925 (8th Cir. 2013) (Wholesale Prods. I). The district court rejected the successors-in-interest theory, as well as the wholesalers' third alternate theory that they could directly enforce their previous arbitration agreements because some of the conduct at issue occurred when the previous agreements were still in effect. The wholesalers appeal.

## I.    BACKGROUND

In 2003, wholesale grocery suppliers SuperValu, Inc. (SuperValu) and C&S Wholesale Grocers, Inc. (C&S) (collectively, wholesalers or defendants) entered into an Asset Exchange Agreement (AEA). C&S had recently purchased Fleming Companies, Inc.'s (Fleming) Midwest wholesale grocery business assets out of bankruptcy. In the AEA, C&S sold Fleming to SuperValu and C&S purchased SuperValu's New England business. Among the assets exchanged were supply agreements and arbitration agreements between each wholesaler and its numerous retail customers (the swap). According to the parties, the AEA contained reciprocal

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

non-compete provisions.[2] See id. at 920. Several retailers sued SuperValu and C&S, alleging the AEA unlawfully allocated the New England market to C&S and the Midwest market to SuperValu, in violation of the Sherman Act, 15 U.S.C. § 1. See Wholesale Prods. I, 707 F.3d at 920.

The plaintiff retailers proposed two classes: Midwest SuperValu customers and New England C&S customers. Each class had an Arbitration Subclass of retailers who had arbitration agreements with SuperValu or C&S during the class period. Village Market (comprised of JFM Market, Inc. and MJF Market, Inc.) was the representative of the putative New England Arbitration Subclass and Millennium Operations, Inc. (Millennium) was the representative of the putative Midwest Arbitration Subclass. This appeal relates to the Arbitration Subclasses (collectively, retailers or plaintiffs).

As the district court explained, the Arbitration Subclasses "each asserted an antitrust conspiracy claim against the wholesaler Defendant with whom it d[id] not [then] do business and d[id] not [then] have an arbitration agreement (the 'nonsignatory Defendant'). . . . Village Market . . . asserted an antitrust claim against SuperValu only, and Millennium . . . asserted an antitrust conspiracy claim against C&S only." The wholesalers moved to dismiss or stay the case, arguing equitable estoppel and successor-in-interest theories allowed the wholesalers to enforce the arbitration agreements to which they were no longer signatories. See id. at 920-21; Federal Arbitration Act, 9 U.S.C. § 1 et seq.

In July 2011, the district court granted the partial motion to dismiss or stay, concluding the nonsignatory defendants could compel arbitration through equitable estoppel. See In re Wholesale Grocery Prods. Antitrust Litig., 2011 WL 9558054, at

_____

[2]The parties agree such provisions existed, although we do not find these provisions in the AEA.

-3-

*3-4. "A non-signatory can 'force a signatory into arbitration under the [equitable] estoppel theory when the relationship of the persons, wrongs and issues involved is a close one.'" Wholesale Prods. I, 707 F.3d at 922 (alteration in original) (quoting CD Partners, LLC v. Grizzle, 424 F.3d 795, 799 (8th Cir. 2005)). "[Equitable] estoppel typically relies, at least in part, on the claims being so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement." Id. (alteration in original) (footnote omitted) (quoting PRM Energy Sys., Inc. v. Primenergy, L.L.C., 592 F.3d 830, 835 (8th Cir. 2010)).

In February 2013, we reversed the district court's equitable estoppel ruling. See id. at 919. We concluded plaintiffs' claims against the nonsignatory defendants were not "'so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement.'" Id. at 923 (quoting PRM Energy Sys., 592 F.3d at 835). This is because plaintiffs' antitrust claims arose out of the Sherman Act, not alleged breaches of the parties' contracts themselves. See id. at 923-24. We remanded the case for the district court to consider the wholesalers' alternate successor-in-interest theory. See id. at 925.

On remand, the wholesalers argued they could enforce each other's arbitration agreements under a "close relationship" exception because they "are successors-in-interest, standing in each other's shoes with respect to the supply and arbitration agreements they exchanged in the AEA." The district court first rejected this theory because SuperValu and C&S did not have the type of close, agency-like relationship that would give rise to an exception to the general rule that a nonsignatory cannot enforce an arbitration agreement.

The district court also reasoned that the nonsignatory defendants were "predecessors-in-interest, not successors-in-interest, to the arbitration agreements they seek to enforce." That is, "SuperValu seeks to enforce the Village Market arbitration agreement that it assigned to C&S under the AEA," so as the assignor, "SuperValu is the predecessor-in-interest." The same is true of C&S's attempt to enforce Millennium's arbitration agreement that C&S assigned to SuperValu. The district court observed the wholesalers had cited no authority supporting "the proposition that a predecessor-in-interest's assignment of rights creates a 'close relationship' with its assignee that warrants allowing the predecessor-in-interest to assert the rights that it unconditionally assigned and voluntarily relinquished."

Finally, the district court rejected the wholesalers' additional theory that "they may directly enforce the arbitration agreements to which they are no longer signatories because some of the events giving rise to Millennium and Village Market's claims occurred before the arbitration agreements were transferred," on the grounds that an "'assignor retains no interest in the right transferred.'" (Quoting Martin ex rel. Hoff v. City of Rochester, 642 N.W.2d 1, 13 (Minn. 2002)). The wholesalers appeal.[3]

## II.  DISCUSSION

We review de novo the district court's decision whether to compel arbitration. See Lebanon Chem. Corp. v. United Farmers Plant Food, Inc., 179 F.3d 1095, 1099 (8th Cir. 1999). The wholesalers advance two legal theories which they believe permit them to compel arbitration under the arbitration agreements they assigned to each other.

---

[3]In 2014, Nemecek Markets, Inc. (Nemecek), a former customer of Fleming, joined the litigation. Nemecek had an arbitration agreement with Fleming, and has agreed to be bound by the arbitrability determination in this case.

### A. Close Relationship/Successor-in-Interest

First, the wholesalers argue that even if they cannot directly enforce the arbitration agreements they assigned, they can enforce them as nonsignatories under a "close relationship" theory. "'[S]tate contract law governs the ability of nonsignatories to enforce arbitration provisions,'" PRM Energy Sys., 592 F.3d at 833 (quoting Donaldson Co. v. Burroughs Diesel, Inc., 581 F.3d 726, 732 (8th Cir. 2009)), and the parties agree Minnesota law applies here. Under that exception, a nonsignatory can compel arbitration "when 'the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between signatories be avoided.'" CD Partners, 424 F.3d at 798 (quoting MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999), abrogated on other grounds by Arthur Andersen LLP v. Carlisle, 556 U.S. 624 (2009)).

The wholesalers cite CD Partners, in which we concluded three corporate officers could compel arbitration under an arbitration agreement to which their corporation was a signatory, even though the officers themselves were not signatories, because the relationship between the corporation and the officers was sufficiently close and because the underlying arbitration agreement would be eviscerated if the officers could not compel arbitration. Id. at 797-800. According to the wholesalers, "the 'close relationship' doctrine is not limited *only* to agents or affiliates of a corporate signatory," but also applies to "'third-party beneficiaries of a contract, . . . corporate officers or corporate entities affiliated with a signatory, or . . . successors-in-interest of a signatory,'" (quoting Cent. Transp. Servs., Inc. v. Cole, No. 13-1295, 2013 WL 6008303, at *4 (D. Kan. Nov. 13, 2013)).

But here, as assignors, the "nonsignatory" defendants are predecessors-in-interest to their assignees, not successors-in-interest. We are aware of no authority supporting the proposition that a predecessor-in-interest bears a sufficiently close relationship to a successor-in-interest such that the predecessor-in-interest can compel

-6-

arbitration under an agreement to which only the successor-in-interest is a signatory. Such a rule could create unforeseen mischief and encourage collusion. We conclude the district court did not err by rejecting this theory.

### B.      Direct Enforcement

Second, the wholesalers assert they can compel arbitration under the agreements to which they were once signatories "because plaintiffs' claims are based on an alleged conspiracy that occurred when the original arbitration agreements were in effect between the arbitration plaintiffs and their former suppliers." The wholesalers quote Litton Financial Printing Division v. NLRB, 501 U.S. 190, 205-06 (1991), for the proposition that "a party's right to compel arbitration survives the expiration of the agreement if the dispute 'involves facts and occurrences that arose before expiration.'" But here the agreements between the wholesalers and the retailers did not expire or terminate, as in Litton. Instead, the wholesalers expressly agreed to "convey, assign, transfer and deliver" to each other "all of [their] right, title and interest" in the underlying supply and arbitration agreements. See also Hoff, 642 N.W.2d at 13 ("An assignment generally operates to transfer all rights possessed by the assignor and the assignor retains no interest in the right transferred."); Restatement (Second) of Contracts § 317(1) ("An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance."). We see no reason to extend a presumption about what rights and obligations the parties to a contract might have intended to keep after the contract expired, see Litton, 501 U.S. at 204-06, to a situation where a party has affirmatively given up—indeed, sold—everything it had under the contract.

The wholesalers insist—and the partial dissent takes for granted, post at 12-13—that Litton's presumption about when a party retains the right to compel arbitration should apply "regardless of what caused the termination of the enforcing

-7-

party's [other] contractual rights and obligations," whether expiration of the contract or deliberate relinquishment. But Litton, following Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union, 430 U.S. 243, 250-54 (1977), was about inferring an intent to arbitrate post-expiration disputes arising out of a contract from the parties' "extensive obligation to arbitrate under the contract," which suggested they did not mean to "eliminate all duty to arbitrate as of the date of expiration." Litton, 501 U.S. at 203-04. Whether the parties to a contract intended to be able to compel arbitration even after assigning away the right to do so, along with all their other rights, is an entirely different matter, and, we think, much less clearly implied by a general willingness to arbitrate disputes arising out of the contractual relationship. For one thing, although parties do not necessarily have the final say over whether a contract is allowed to expire or is terminated by their counterparty, and presumably would not want to subject the availability of "a pivotal dispute resolution provision" to such fortuities, id. at 208, they generally do have control over whether and when they transfer their own rights.

In important respects, this case presents the flip side of Koch v. Compucredit Corp., 543 F.3d 460 (8th Cir. 2008). There, one bank had assigned a contract containing an arbitration clause to another. See id. at 462-63. After applying Litton to conclude the obligation to arbitrate survived even though the contract arguably had terminated, we held the assignee bank could compel arbitration of a dispute arising out of the contract because "[t]hrough the assignment, [the assignee] assumed all of [the assignor's] remaining rights and obligations under the contract." Id. at 465-67. Here, it is the assignors, not their assignees, claiming a right to compel arbitration. The clear consequence of Koch's logic is that the assignors—in this case, the nonsignatory wholesalers—should have nothing left to enforce, since "all of [their] remaining rights" were "assumed" by someone else.

It is true, as the partial dissent points out, "[t]he Asset Exchange Agreement did not transfer pre-assignment liabilities." Post at 12. Knowing that, as they must have,

perhaps the wholesalers should have bargained not to transfer the corresponding rights to compel arbitration on disputes regarding those pre-assignment liabilities. But they did not, and nothing in <u>Litton</u> or <u>Koch</u> convinces us to treat them like they did.[4]  The wholesalers may not directly enforce the arbitration agreements to which they are no longer signatories.

## III.    CONCLUSION

The district court is affirmed.

COLLOTON, Circuit Judge, concurring in the judgment in part and dissenting in part.

The principal question on this appeal is whether the antitrust plaintiffs in this case are required to arbitrate their claims against the wholesale grocer defendants, SuperValu, Inc. and C&S Wholesaler Grocers, Inc.  I conclude that the claims brought by Village Market against SuperValu are subject to arbitration, and I would therefore reverse the decision of the district court in relevant part.

From April 2001 through September 2003, Village Market and SuperValu were parties to a supply agreement that was accompanied by an arbitration agreement.  The

---

[4]We also find questionable the wholesalers' position that because some of the challenged conduct occurred before the execution of the AEA, and some of it occurred after, both the assignor and assignee wholesaler can enforce the arbitration agreement in the same dispute.  <u>See</u> <u>HT of Highlands Ranch, Inc. v. Hollywood Tanning Sys., Inc.</u>, 590 F. Supp. 2d 677, 684 (D.N.J. 2008) (explaining that if all rights and obligations under a contract are transferred, the assignor's right to compel arbitration is extinguished, while leaving "unresolved" the factual matter of what rights the assignor actually transferred); <u>cf.</u> <u>RRCI Constructors, LLC v. Charlie's/Diamond Ready Mix, Inc.</u>, No. 2007-147, 2009 WL 799660, at *5 (D.V.I. Mar. 24, 2009) (rejecting the theory that "both the assignor and assignee of an agreement may be compelled to arbitrate a dispute that comes within the scope of a valid arbitration agreement.  Such a position is unsupported by law").

arbitration agreement required arbitration of "[a]ny controversy, claim or dispute of whatever nature arising between [Village Market] and SUPERVALU . . ., including but not limited to those arising out of or relating to any agreement between the parties." App. 106.

In September 2003, as part of an asset exchange between SuperValu and C&S, Supervalu assigned its agreements with Village Market to C&S. Village Market later brought an antitrust claim against SuperValu, alleging that SuperValu conspired with C&S in violation of the Sherman Act. For several years, the parties have litigated whether Village Market should be compelled to submit its antitrust claim against SuperValu to arbitration. *See In re Wholesale Grocery Prods. Antitrust Litigation*, 707 F.3d 917 (8th Cir. 2013).

In this appeal, SuperValu contends that because Village Market alleges an antitrust conspiracy that began while the parties were subject to an agreement that required arbitration of such a claim, Village Market should be compelled to submit the antitrust claim to arbitration. Applying the principles set forth in *Litton Financial Printing Division v. NLRB*, 501 U.S. 190 (1991), and *Koch v. Compucredit Corporation*, 543 F.3d 460 (8th Cir. 2008), I would direct the district court to compel arbitration. That Supervalu later assigned the arbitration agreement to C&S does not eliminate Village Market's obligation to arbitrate a dispute that involves facts and occurrences that arose before the assignment.

*Litton* raised the question whether parties to a collective bargaining agreement with an arbitration clause had a duty to arbitrate grievances that were brought by a union after the expiration of the agreement. *Litton* applied *Nolde Brothers, Inc. v. Bakery Workers*, 430 U.S. 243 (1977), which found in the context of an expired agreement that there were "strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract." *Id*. at 253. *Nolde Brothers* established "a presumption in favor of postexpiration arbitration of

matters unless 'negated expressly or by clear implication,'" *id*. at 204 (quoting *Nolde Brothers*, 430 U.S. at 255), as long as the arbitration was "of matters and disputes arising out of the relation governed by contract." *Id*.

*Litton* clarified that *Nolde Brothers* applies "only where a dispute has its real source in the contract." *Id*. at 205. In other words, "[t]he *Nolde Brothers* presumption is limited to disputes arising under the contract." *Id*. "A postexpiration grievance," the Court explained, "can be said to arise under the contract only where [1] it involves facts and occurrences that arose before expiration, [2] where an action taken after expiration infringes a right that accrued or vested under the agreement, or [3] where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Id*. at 206. Because the employee layoffs at issue in *Litton* took place almost one year *after* expiration of the agreement, and the second and third categories were not implicated, the grievance was not arbitrable. *Id*. at 209-10.

In *Koch*, this court applied *Litton* outside the context of collective bargaining. *Koch* involved a credit agreement with an arbitration clause. A credit card obligor alleged violations of the Federal Debt Collection Practices Act by the creditor, and assignees of the original creditor sought to compel arbitration. We concluded that even though the underlying credit agreement arguably was terminated by an earlier settlement, the obligation of the parties to arbitrate disputes arising under the contract survived any termination. Because the dispute at issue there involved facts and occurrences that arose before expiration of the credit agreement, it was a dispute "aris[ing] under the contract." 543 F.3d at 466 (quoting *Litton*, 501 U.S. at 206). The dispute also fell within the scope of the arbitration clause, which covered "any claim, dispute, or controversy arising from or related to the Agreement." *Id*. Because the obligor's claim "would have been subject to [arbitration] had it arisen during the contract's term," *id*. (quoting *Nolde Bros.*, 430 U.S. at 252), and nothing in the arbitration clause excluded a dispute that was based in part on events occurring after

termination of the agreement, we directed the district court to compel arbitration. *Id*. at 466-67.

A similar analysis demonstrates that Village Market should be compelled to arbitrate its antitrust claim against SuperValu. Village Market's antitrust claim involves facts and occurrences that arose before SuperValu assigned the arbitration agreement in September 2003: the claim is that SuperValu formed an antitrust conspiracy while negotiating an asset exchange agreement with C&S between July and September 2003. Although the arbitration agreement was assigned in September 2003, the evidence does not clearly negate a presumption that the parties intended to arbitrate matters that arose under the contract before the assignment. If, for example, Village Market and SuperValu found themselves in a mine-run dispute under the supply agreement based on events in July 2003, there is nothing in the various agreements to suggest that the parties wanted that dispute litigated in federal court just because SuperValu assigned the arbitration agreement to C&S in September 2003. The Asset Exchange Agreement did not transfer pre-assignment liabilities. Although the instant claim asserts an antitrust violation rather than a breach of the supply agreement, the broad arbitration agreement covers it: "[a]ny controversy, claim or dispute of whatever nature arising between [Village Market] and SUPERVALU" must be arbitrated.

In rejecting SuperValu's position, the court declines to apply the *Nolde Brothers* presumption of intent to arbitrate when a contract is assigned, apparently because an assignor "generally has control over whether and when they transfer their own rights." *Ante*, at 8. But of course a contracting party generally has control over the expiration of a contract too: the termination date is a negotiated term of the agreement. The point of *Nolde Brothers* is that even when parties intentionally cause a contractual relationship to end, there are strong reasons to believe that the parties intend to retain arbitration duties for disputes arising under the contract. A contrary rule "would preclude the entry of a post-contract arbitration order even when the

-12-

dispute arose during the life of the contract but arbitration proceedings had not begun before termination. The same would be true if arbitration processes began but were not completed, during the contract's term." 430 U.S. at 251. The Court thought "it could not seriously be contended in either instance that the expiration of the contract would terminate the parties' contractual obligation to resolve such a dispute in an arbitral, rather than a judicial forum," *id.*, yet the majority reaches precisely that unlikely conclusion here.

In a footnote, *ante*, at 9 n.4, the majority also questions whether assignment of the agreement extinguished SuperValu's right to compel arbitration. But the cited decision of a district court—accepting a broad allegation as true on a motion to dismiss—said only that the extent to which an assignment transferred the right to compel arbitration was "an unresolved issue." *HT of Highlands Ranch, Inc. v. Hollywood Tanning Sys., Inc.*, 590 F. Supp. 2d 677, 684 (D.N.J. 2008). Two other district courts have concluded that an assignor seeking to arbitrate a dispute arising before the assignment is still a "party aggrieved" who may compel arbitration under the Federal Arbitration Act. *Vainqueur Corp. v. Lamborn & Co.*, 305 F. Supp. 1007, 1008 (S.D.N.Y. 1969); *Stations West, LLC v. Pinnacle Bank of Oregon*, No. CIV 06-1419-KI, 2007 WL 1219952, at *3 (D. Or. Apr. 23, 2007). Consistent with our circuit precedent in *Koch*, the better view is that unless there is persuasive evidence that parties intended to extinguish a duty to arbitrate disputes that are based in part on facts that arose *before* an assignment, the arbitration agreement continues in effect as to those disputes. Accordingly, I would direct the district court to compel arbitration of Village Market's claim against SuperValu.[5]

---

[5]The majority's effort, *ante*, at 8, to glean support from the "logic" of *Koch* is unpersuasive. In *Koch*, an assignor *transferred* pre-assignment assets and liabilities to an assignee, and the assignee was then entitled to compel arbitration of a pre-assignment dispute. Here, the assignor *retained* pre-assignment liabilities, and *Koch* says nothing to undermine the presumption that pre-assignment disputes arising under the contract remain subject to arbitration under the terms of the original agreement.

As to the appeal by C&S concerning arbitration of the antitrust claim brought by Millennium Operations, I concur in the judgment affirming the district court. It is doubtful that C&S actually acquired Millennium's supply agreement after Fleming Companies went through bankruptcy. The Asset Exchange Agreement required C&S to "use reasonable best efforts *to cause Fleming* to convey" the assets at issue "*directly to SuperValu*." In any event, the scope of Millennium's arbitration agreement was narrower than Village Market's. It provided only for arbitration of disputes "relating to this Agreement," and alleged unlawful restraint of trade is not conduct relating to the retail supply agreement. *See In re Wholesale Grocery Products*, 707 F.3d at 923-24. I also agree with the court that C&S cannot compel arbitration under a "close relationship" theory.

For these reasons, I would affirm the decision of the district court concerning the claim of Millennium Operations, but reverse the decision concerning Village Market and remand with directions to compel arbitration of Village Market's claim against SuperValu.

_____