RILEY, Chief Judge.
A number of retail grocers sued two large full-line wholesale grocers, alleging the wholesalers’ contract to exchange retailer supply agreements constituted market allocation in violation of the Sherman Act, see 15 U.S.C. § 1. The retailers formed two putative classes, the Midwest Class and the New England Class. Each class had an Arbitration Subclass of retailers who had arbitration agreements with their current (post-swap) wholesaler. Each Arbitration Subclass sued only its previous wholesaler, with which it no longer had a current arbitration agreement. The district court[1] dismissed the Arbitration Subclasses from the case on the theory that the previous wholesalers, as “nonsignatory” defendants, could compel the retailers to arbitrate based on equitable estoppel. See In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090, 2011 WL 9558054, at *3-4 (D. Minn. July 5, 2011).
We reversed and then remanded for the district court to consider the wholesalers’ alternate theory that the nonsignatory defendants could compel arbitration because they were successors-in-interest to the signatory defendants. See In re Wholesale Grocery Prods. Antitrust Litig., 707 F.3d 917, 919-20, 925 (8th Cir. 2013) (Wholesale Prods. I). The district court rejected the successors-in-interest theory, as well as the wholesalers’ third alternate theory that they could directly enforce their previous *347 arbitration agreements because some of the conduct at issue occurred when the previous agreements were still in effect. The wholesalers appeal.
1. BACKGROUND
In 2003, wholesale grocery suppliers Su-perValu, Inc. (SuperValu) and C&S Wholesale Grocers, Inc. (C&S) (collectively, wholesalers or defendants) entered into an Asset Exchange Agreement (AEA). C&S had recently purchased Fleming Companies, Inc.’s (Fleming) Midwest wholesale grocery business assets out of bankruptcy. In the AEA, C&S sold Fleming to Super-Valu and C&S purchased SuperValu’s New England business. Among the assets exchanged were supply agreements and arbitration agreements between each wholesaler and its numerous retail customers (the swap). According to the parties, the AEA contained reciprocal non-compete provisions.[2] See id. at 920. Several retailers sued SuperValu and C&S, alleging the AEA unlawfully allocated the New England market to C&S and the Midwest market to SuperValu, in violation of the Sherman Act, 15 U.S.C. § 1. See Wholesale Prods. I, 707 F.3d at 920.
The plaintiff retailers proposed two classes: Midwest SuperValu customers and New England C&S customers. Each class had an Arbitration Subclass of retailers who had arbitration agreements with Su-perValu or C&S during the class period. Village Market (comprised of JFM Market, Inc. and MJF Market, Inc.) was the representative of the putative New England Arbitration Subclass and Millennium Operations, Inc. (Millennium) was the representative of the putative Midwest Arbitration Subclass. This appeal relates to the Arbitration Subclasses (collectively, retailers or plaintiffs).
As the district court explained, the Arbitration Subclasses “each asserted an antitrust conspiracy claim against the wholesaler Defendant with whom it d[id] not [then] do business and d[id] not [then] have an arbitration agreement (the ‘non-signatory Defendant’).... Village Market ... asserted an antitrust claim against SuperValu only, and Millennium ... asserted an antitrust conspiracy claim against C&S only.” The wholesalers moved to dismiss or stay the case, arguing equitable estoppel and successor-in-interest theories allowed the wholesalers to enforce the arbitration agreements to which they were no longer signatories. See id. at 920-21; Federal Arbitration Act, 9 U.S.C. § 1 et seq.
In July 2011, the district court granted the partial motion to dismiss or stay, concluding the nonsignatory defendants could compel arbitration through equitable es-toppel. See In re Wholesale Grocery Prods. Antitrust Litig., 2011 WL 9558054, at *3-4. “A non-signatory can ‘force a signatory into arbitration under the [equitable] estoppel theory when the relationship of the persons, wrongs and issues involved is a close one.’ ” Wholesale Prods. I, 707 F.3d at 922 (alteration in original) (quoting CD Partners, LLC v. Grizzle, 424 F.3d 795, 799 (8th Cir. 2005)). “[Equitable] es-toppel typically relies, at least in part, on the claims being so intertwined, with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement.” Id. (alteration in original) (footnote omitted) (quoting PRM En *348 ergy Sys., Inc. v. Primenergy, L.L.C., 592 F.3d 830, 835 (8th Cir. 2010)).
In February 2013, we reversed the district court’s equitable estoppel ruling. See id.,at 919. We concluded plaintiffs’ claims against the nonsignatory defendants were not “ ‘so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement.’ ” Id. at 923 (quoting PRM Energy Sys., 592 F.3d at 835). This is because plaintiffs’ antitrust claims arose out of the Sherman Act, not alleged breaches of the parties’ contracts themselves. See id. at 923-24. We remanded the case for the district court to consider the wholesalers’ alternate successor-in-interest theory. See id. at 925.
On remand, the wholesalers argued they could enforce each other’s arbitration agreements under a “close relationship” exception because they “are successors-in-interest, standing in each other’s shoes with respect to the supply and arbitration agreements they exchanged in the AEA.” The district court first rejected this theory because SuperValu and C&S did not have the type of close, agency-like relationship that would give rise to an exception to the general rule that a nonsignatory cannot enforce an arbitration agreement.
The district court also reasoned that the nonsignatory defendants were “predecessors-in-interest, not successors-in-interest, to the arbitration agreements they seek to enforce.” That is, “SuperValu seeks to enforce the Village Market arbitration agreement that it. assigned to C&S under the AEA,” so as the assignor, “SuperValu is the predecessor-in-interest.” The same is true of C&S’s attempt to enforce Millennium’s arbitration agreement that C&S assigned to SuperValu. The district court observed the wholesalers had cited no authority supporting “the proposition that a predecessor-in-interest’s assignment of rights creates a ‘close relationship’ with its assignee that warrants allowing the predecessor-in-interest to assert the rights that it unconditionally assigned and voluntarily relinquished.”
Finally, the district court rejected the wholesalers’ additional theory that “they may directly enforce the arbitration agreements to which they are no longer signatories because some of the events giving rise to Millennium and Village Market’s claims occurred before the arbitration agreements were transferred,” on the grounds that an “ ‘assignor retains no interest in the right transferred.’ ” (Quoting Martin ex rel. Hoff v. City of Rochester, 642 N.W.2d 1, 13 (Minn. 2002)). The wholesalers appeal.[3]
II. DISCUSSION
We review de novo the district court’s decision whether to compel arbitration. See Lebanon Chem. Corp. v. United Farmers Plant Food, Inc., 179 F.3d 1095, 1099 (8th Cir. 1999). The wholesalers advance two legal theories which they believe permit them to compel arbitration under the arbitration agreements they assigned to each other.
A. Close Relationship/Successor.-in-Interest
First, the wholesalers argue that even if they cannot directly enforce the arbitration agreements they assigned, they can enforce them as nonsignatories under *349 a “close relationship” theory. “ ‘[S]tate contract law governs the ability of nonsignato-ries to enforce arbitration provisions,' '' PRM Energy Sys., 592 F.3d at 833 (quoting Donaldson Co. v. Burroughs Diesel, Inc., 581 F.3d 726, 732 (8th Cir. 2009)), and the parties agree Minnesota law applies here. Under that exception, a nonsignatory can compel arbitration “when ‘the relationship between the signatory and nonsigna-tory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between signatories be avoided.’ ” CD Partners, 424 F.3d at 798 (quoting MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999), abrogated on other grounds by Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009)).
The wholesalers cite CD Partners, in which we concluded three corporate officers could compel arbitration under an arbitration agreement to which their corporation was a signatory, even though the officers themselves were not signatories, because the relationship between the corporation and the officers was sufficiently close and because the underlying arbitration agreement would be eviscerated if the officers could not compel arbitration. Id. at 797-800. According to the wholesalers, “the ‘close relationship’ doctrine is not limited only to agents or affiliates of a corporate signatory,” but also applies to “ ‘third-party beneficiaries of a contract, ... corporate officers or corporate entities affiliated with a signatory, or ... successors-in-interest of a signatory,’” (quoting Cent. Transp. Servs., Inc. v. Cole, No. 13-1295, 2013 WL 6008303, at *4 (D. Kan. Nov. 13, 2013)).
But here, as assignors, the “nonsignato-ry” defendants are predecessors-in-interest to their assignees, not successors-in-interest. We are aware of no authority supporting the proposition that a predecessor-in-interest bears a sufficiently close relationship to a successor-in-interest such that the predecessor-in-interest can compel arbitration under an agreement to which only the successor-in-interest is a signatory. Such a rule could create unforeseen mischief and encourage collusion. We conclude the district court did not err by rejecting this theory.
B. Direct Enforcement
Second, the wholesalers assert they can compel arbitration under the agreements to which they were once signatories “because plaintiffs’ claims are based on an alleged conspiracy that occurred when the original arbitration agreements were in effect between the arbitration plaintiffs and their former suppliers.” The wholesalers quote Litton Financial Printing Division v. NLRB, 501 U.S. 190, 205-06, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991), for the proposition that “a party’s right to compel arbitration survives the expiration of the agreement if the dispute ‘involves facts and occurrences that arose before expiration.’ ” But here the agreements between the wholesalers and the retailers did not expire or terminate, as in Litton. Instead, the wholesalers expressly agreed tq “convey, assign, transfer and deliver” to each other “all of [their] right, title and interest” in the underlying supply and arbitration agreements. See also Hoff, 642 N.W.2d at 13 (“An assignment generally operates to transfer all rights possessed by the assignor and the assignor retains no interest in the right transferred.”); Restatement (Second) of Contracts § 317(1) (“An assignment of a right is a manifestation of the assignor’s intention to transfer it by virtue of which the assignor’s right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance.”). We *350 see no reason to extend a presumption about what rights and obligations the parties to a contract might have intended to keep after the contract expired, see Litton, 501 U.S. at 204-06, 111 S.Ct. 2215, to a situation where a party has affirmatively given up — indeed, sold — everything it had under the contract.
The wholesalers insist — and the partial dissent takes for granted, post at 352-53-that Litton’s presumption about when a party retains the right to compel arbitration should apply “regardless of what caused the termination of the enforcing party’s [other] contractual rights and obligations,” whether expiration of the contract or deliberate relinquishment. But Litton, following Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 250-54, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), was about inferring an intent to arbitrate post-expiration disputes arising out of a contract from the parties’ “extensive obligation to arbitrate under the contract,” which suggested they did not mean to “eliminate all duty to arbitrate as of the date of expiration.” Litton, 501 U.S. at 203-04, 111 S.Ct. 2215. Whether the parties to a contract intended to be able to compel arbitration even after assigning away the right to do so, along with all their other rights, is an entirely different matter, and, we think, much less clearly implied by a general willingness to arbitrate disputes arising out of the contractual relationship. For one thing, although parties do not necessarily have the final say over whether a contract is allowed to expire or is terminated by their counterparty, and presumably would not want to subject the availability of “a pivotal dispute resolution provision” to such fortuities, id. at 208, 111 S.Ct. 2215, they generally do have control over whether and when they transfer their own rights.
In important respects, this case presents the flip side of Koch v. Compucredit Corp., 543 F.3d 460 (8th Cir. 2008). There, one bank had assigned a. contract containing an arbitration clause to another. See id. at 462-63. After applying Litton to conclude the obligation to arbitrate survived even though the contract arguably had terminated, we held the assignee bank could compel arbitration of a dispute arising out of the contract because “[t]hrough the assignment, [the assignee] assumed all of [the assignor’s] remaining rights and obligations under the contract.” Id. at 465-67. Here, it is the assignors, not their assignees, claiming a right to compel arbitration. The clear consequence of Koch’s logic is that the assignors' — in this case, the non-signatory wholesalers — should have nothing left to enforce, since “all of [their] remaining rights” were “assumed” by someone else.
It is true, as the partial dissent points out, “[t]he Asset Exchange Agreement did not transfer pre-assignment liabilities.” Post at 352. Knowing that, as they must have, perhaps the wholesalers should have bargained not to transfer the corresponding rights to compel arbitration on disputes regarding those pre-assignment liabilities. But they did not, and nothing in Litton or Koch convinces us to treat them like they did.[4] The wholesalers may not *351 directly enforce the arbitration agreements to which they are no longer signatories.
III. CONCLUSION
The district court is affirmed.

. The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

. The parties agree such provisions existed, although we do not find these provisions in the AEA.

. In 2014, Nemecek Markets, Inc. (Nemecek), a former customer of Fleming, joined the litigation. Nemecek had an arbitration agreement with Fleming, and has agreed to be bound by the arbitrability determination in this case.

. We also find questionable the wholesalers’ position that because some of the challenged conduct occurred before the execution of the AEA, and some of it occurred after, both the assignor and assignee wholesaler can enforce the arbitration agreement in the same dispute. See HT of Highlands Ranch, Inc. v. Hollywood Tanning Sys., Inc., 590 F.Supp.2d 677, 684 (D.N.J. 2008) (explaining that if all rights and obligations under a contract are transferred, the assignor’s right to compel arbitration is extinguished, while leaving “unresolved” the factual matter of what rights the assignor actually transferred); cf. RRCI Constructors, LLC v. Charlie's/Diamond Ready Mix, Inc., No. 2007-147, 2009 WL 799660, at *351 *5 (D.V.I. Mar. 24, 2009) (rejecting the theory that "both the assignor and assignee of an agreement may be compelled to arbitrate a dispute that comes within the scope of a valid arbitration agreement. Such a position is unsupported by law”).